# Richmond

JOAN deSARDON GLASS, ET AL., ETC.

V.

THOMAS R. GLASS, ET AL.

Record No. 811690.

September 7, 1984.

Present: Carrico, C.J., Cochran, Compton, Stephenson, Russell, and Thomas, JJ., and Harrison, Retired Justice.

*William B. Hopkins; William B. Hopkins, Jr. (Martin, Hopkins, Lemon and Carter, P.C.*, on briefs), for appellants.
*Anne Marie Whittemore (Robert H. Patterson, Jr.; Robert E. Draim; McGuire, Woods & Battle*, on brief), for appellees.

COCHRAN, J., delivered the opinion of the Court.

The executors and legatees under the will of Powell Glass, Jr., deceased, and the substitute trustee for Anne Cleghorn Glass, filed as plaintiffs[1] an amended motion for judgment in the trial court against Thomas R. Glass and others.[2] Plaintiffs, alleging that defendants conspired to prevent them from obtaining a fair price for their stock in Carter Glass & Sons Publishers, Inc. (the Corporation), sought compensatory damages of $6,932,758.30 and punitive damages of $5,000,000, a total of $11,932,758.30, with interest, from defendants jointly and severally. Defendants filed demurrers which the trial court sustained by final order entered July 9, 1981.

On appeal, appellants (hereafter, plaintiffs) argue that their amended motion for judgment stated a cause of action against ap-

---

[1] Plaintiffs in the amended motion for judgment were Joan deSardon Glass and United Virginia Bank, Successor to United Virginia Bank/First National, as Executors of the Estate of Powell Glass, Jr., Joan deSardon Glass, individually, Anne Cleghorn Glass Cothran, Marianna Rhett Glass Crompton, Alicia Middleton Glass, and United Virginia Bank, Successor to United Virginia Bank/First National, as Substituted Trustee for Anne Cleghorn Glass.

[2] Defendants were Thomas R. Glass, John G. Boatwright, Elizabeth B. Updike, Lapsley W. Hamblen, Jr., Walter B. Potter, E. Garland Key, William H. Russell, III, Central Fidelity Bank, as Executor of the Estate of Ria Thomas Glass, deceased, and Central Fidelity Bank, as Co-Executor of the Estate of Mary Archer Glass Boatwright, deceased.

pellees (hereafter, defendants) in two respects: first, that defendants combined with other stockholders to deny plaintiffs a market for selling their stock at a fair price and second, that defendants tortiously interfered with plaintiffs' contractual relations. In reviewing the trial court's rulings, we will accept as true all allegations of fact that are well pleaded in the voluminous amended motion for judgment.

For many years before his death in 1946, Carter Glass, Sr., owned and operated two newspapers in Lynchburg. After his death, the business was operated first as an equal partnership by Powell Glass, Jr., Carter Glass, Jr., and Mary Archer Glass Boatwright, then as three separate corporations, and finally as the Corporation, a single entity. On March 1, 1974, Powell Glass, Jr., became the Corporation's president and publisher. He, Mary Archer Glass Boatwright, and Ria Thomas Glass (widow of Carter Glass, Jr.) were the Corporation's principal stockholders, their shares aggregating 62.794% of the issued and outstanding stock.

In 1977, two prospective purchasers expressed interest in buying the Corporation. Each offered approximately $70 per share based on three and one-half times the Corporation's gross earnings. Mary Archer Glass Boatwright and Thomas R. Glass, who had acquired an interest in the Corporation under the will of his father, Carter Glass, Jr., opposed the sale. Plaintiffs alleged that John G. Boatwright, Thomas R. Glass, Lapsley W. Hamblen, Jr., and E. Garland Key, fearing that they would lose their positions as officers and directors of the Corporation if a majority interest were sold, successfully carried out a plan to remove Powell Glass, Jr., as president and publisher. In addition, they allegedly tried to remove him as a director, but their efforts resulted in litigation and ultimately failed. Thomas R. Glass became president of the Corporation.

Mary Archer Glass Boatwright died testate in December, 1978; John G. Boatwright and Central Fidelity Bank qualified as Executors under her will. Ria Thomas Glass died testate in January, 1979; Central Fidelity Bank qualified as Executor under her will. Powell Glass, Jr., died testate in February, 1979; Joan deSardon Glass and United Virginia Bank qualified as Executors under his will.

In January of 1979, a trade paper reported the sale of two newspapers in Texas for five times their gross earnings. Sale of the

Corporation's stock at five times 1978 gross earnings would have realized $129.266 per share, assuming the stock was sold as a whole.

Plaintiffs alleged that defendants Lapsley W. Hamblen, Jr., Thomas R. Glass, Walter G. Potter, John G. Boatwright, and Elizabeth B. Updike, who were the directors of the Corporation, conspired to have the Corporation's stock appraised at an unrealistically low value to prevent plaintiffs from selling their stock to anyone but other stockholders or the Corporation itself. The directors employed two appraisers, from whom they withheld information as to the written offers for the Corporation. One appraiser valued the stock at $32 per share if sold as a whole and $23 per share if sold as a minority interest; the other appraiser valued the stock at $38.60 if sold as a whole and $24.50 if sold as a minority interest. Defendants offered to buy plaintiffs' stock on the basis of these appraisals. Plaintiffs declined the offer as inadequate but, knowing that it would be necessary to sell some or all of the stock to pay Federal and State taxes on the estate of Powell Glass, Jr., sought to find another purchaser.

Gannett, Inc., offered to buy plaintiffs' stock at a 40% discount from the estimated valued of all stock in the Corporation. Plaintiffs made a counteroffer to sell for $56 per share, being $80 less a 30% discount for a minority interest, with a proviso that the discount would be recovered if Gannett were to obtain a controlling interest in the Corporation within one year. Before acting on the counteroffer, Gannett's representative talked to Thomas R. Glass, who informed him that the other stockholders had agreed to act as a unit to prevent Gannett from acquiring a controlling interest. Glass said, however, that if Gannett did not buy plaintiffs' stock Gannett would be given the first option to buy if the "majority interest" were sold. As a result of these representations, Gannett decided not to purchase plaintiffs' stock.

The directors induced all stockholders except plaintiffs to send letters to the president or executive vice-president of the Corporation expressing an intent to form a voting trust whereby their stock would be offered first to the Corporation or to the other stockholders if a sale became necessary. William H. Russell, III, vice-president and trust officer of Central Fidelity Bank, sent a similar letter on behalf of the estates of Mary Archer Glass Boatwright and Ria Thomas Glass. Plaintiffs alleged that these letters were executed for the sole purpose of denying them a free market

for their stock. They also alleged that Russell knew that the estates which he represented could not retain their stock if it were appraised at substantially more than $40 per share.

Defendants rejected plaintiffs' proposal that all stock in the Corporation be sold, plaintiffs' proposal that they not be impeded in their effort to sell their stock to Gannett or some other purchaser, and plaintiffs' offer to sell their stock to the Corporation or other stockholders at the discounted price offered by Gannett. Defendants allegedly "made it plain" that they would do all they could to prevent a sale of plaintiffs' stock to anyone other than the officers and directors, other stockholders, or the Corporation.

Plaintiffs thereupon entered into secret negotiations with Robert S. Howard, president of Howard Publications, Inc. (Howard). These negotiations culminated in the execution of a contract dated June 19, 1979, which provided for Howard to purchase plaintiffs' 106,758 shares of stock for $6,863,151, or $64.287 per share. The price represented a 25% discount for a minority interest. The contract further provided that Howard would pay an additional $915,086.87 if it were to acquire 51% of the Corporation's stock within one year, or an additional $2,287,717.18 if it were to acquire 80% of the stock within one year.

Robert S. Howard informed Thomas R. Glass and Russell of the contract's provisions and offered to buy all the remaining stock in the Corporation for $85.716 per share. The offer was to expire on July 9, 1979. On July 2, 1979, however, defendants and the other stockholders negotiated an offer from Worrell Newspapers, Inc. to buy their stock for $90 a share, contingent on the purchaser's obtaining financing. The offer also provided that if Worrell acquired 69% of the Corporation's stock, it would have the Corporation enter into employment contracts, in specified amounts for specified periods, with defendants Thomas R. Glass, Hamblen, Potter, and Key. Plaintiffs alleged that these defendants, desirous of obtaining the employment contracts, acted with Russell to prevent Howard from obtaining control of the Corporation. Plaintiffs alleged that Russell used misrepresentations to induce Howard to extend the expiration date on its offer to July 23, 1979, to give Worrell additional time to obtain financing. Without the extension, Howard's offer would have been accepted and plaintiffs would have received an additional $2,287,717.18 under their contract with Howard.

After obtaining the extension, Russell told Robert S. Howard that he need not communicate with other stockholders directly and that no competing bids had been received. On July 17, Russell and Robert S. Howard agreed to the manner and method of concluding Howard's purchase of the remaining stock, the closing to be held at a bank in Chicago, Illinois, on July 23. In addition, Robert S. Howard requested that Russell inform him of any competing bids and allow him to bid again if there were any. Russell again stated that there were no other bids, that he would place Howard's offer before his bank's trust committee on July 18, and that he "saw no problem" in having the bid approved. After talking with Russell, Robert S. Howard telephoned Thomas R. Glass and informed him that Howard would continue his employment contract and would reduce the contract to writing for five years. Glass expressed his appreciation and said that he expected the sale of the majority stock to be completed as scheduled.

On July 19, Russell called Robert S. Howard and informed him that the majority stockholders had sold their stock to Worrell. Had Howard known of Worrell's offer of $90 per share, it would have increased its offer to at least $92 a share. Plaintiffs alleged that defendants did not act with fidelity toward Howard as a stockholder because they were determined to injure plaintiffs. Plaintiffs also alleged that defendants knew Howard would not agree to the favorable employment contracts that Worrell offered and that these contracts were executed without notice to other stockholders solely for the benefit of the defendant officers and directors and contrary to the best interests of the Corporation, its stockholders, and the plaintiffs.

Plaintiffs alleged that defendant officers and directors, while aware of the advisability of selling the Corporation's stock as a whole for what "in all likelihood" would have been $129.226 per share, "conspired to promote their own selfish interest" at the expense of plaintiffs, other stockholders, and the Corporation. Plaintiffs alleged that these defendants induced Russell and Central Fidelity Bank to join their conspiracy for the purpose of tortiously, maliciously, and knowingly injuring plaintiffs. Plaintiffs claimed as compensatory damages the difference between $64.287 per share, what they received for their stock, and $129.226 per share, what they allegedly would have received if defendants had not interfered. They also claimed punitive damages.

Plaintiffs contend that the allegations in the amended motion for judgment show that a conspiracy arose before the Howard negotiations began. This conspiracy, they say, tortiously injured them by denying them a market for their stock, by inducing all stockholders except plaintiffs to agree to vote as a unit to prevent plaintiffs from selling their stock at a fair price, and by having the stock in the estates of Mary Archer Glass Boatwright and Ria Thomas Glass appraised at less than its fair value.

Plaintiffs argue that the conspiracy continued after the Howard contract was executed, that in order to damage plaintiffs defendants misled Robert S. Howard into granting an extension of time on his offer, falsely promised to advise him of competing bids, denied him the opportunity to bid again, and agreed to sell to Worrell to obtain favorable employment contracts for the sole benefit of the officers and directors. These acts, plaintiffs contend, constituted an unlawful interference with plaintiffs' contractual relations with Howard.

### 1. Conspiracy to prevent plaintiffs from selling their stock at a fair price.

A civil conspiracy is a combination of two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means, resulting in damage to the plaintiff. *Allen Realty Corporation* v. *Holbert*, 227 Va. 441, 448-49, 318 S.E.2d 592, 596 (1984); *Gallop* v. *Sharp*, 179 Va. 335, 338, 19 S.E.2d 84, 86 (1942). *See Harrison* v. *United Transportation Union*, 530 F.2d 558, 561 (4th Cir. 1975), *cert. denied*, 425 U.S. 958 (1976).

Corporate officers and directors have a fiduciary duty in their dealings with shareholders and must exercise good faith in such dealings. *Adelman* v. *Conotti Corporation*, 215 Va. 782, 790, 213 S.E.2d 774, 779 (1975). The question is whether the combined action of the defendant officers and directors (in which Russell and Central Fidelity Bank united)[3] violated their duty to act in good faith toward plaintiffs and constituted a civil conspiracy.

---

[3] Russell and Central Fidelity Bank were not officers or directors, but as members of the alleged conspiracy, they could be associated with any breaches of duty committed by appellee officers and directors. *See, e.g., B. R. Paulsen & Co.* v. *Lee*, 95 Ill. App.2d 146, 237 N.E.2d 793 (1968).

██ One of the obvious advantages arising from use of the corporate form of business entity is the relative ease with which shares of stock representing ownership interests in the corporation may be transferred. In general, shareholders may dispose of their stock as they see fit. *See Tryon* v. *Smith*, 191 Or. 172, 178-79, 229 P.2d 251, 254 (1951); *Alderman* v. *Alderman*, 178 S.C. 9, 43, 181 S.E. 897, 911 (1935); *Roby* v. *Dunnett*, 88 F.2d 68, 69 (10th Cir. 1937). The sale of a majority stock interest by an officer or director may result in a breach of his fiduciary duty, however, if the circumstances indicate that the purchasers will loot or mismanage the corporation, or if the sale involves fraud, misuse of confidential information, wrongful appropriation of corporate assets, or personal use of a business advantage that rightfully belongs to the corporation. *See Ritchie* v. *McGrath*, 1 Kan. App.2d 481, 487, 571 P.2d 17, 22 (1977); *McDaniel* v. *Painter*, 418 F.2d 545, 547-48 (10th Cir. 1969).

In *Ritchie*, upon which the trial court in the present case relied, defendant shareholders made a private oral agreement to purchase enough additional stock to give them a controlling interest in a bank. Upon acquisition of the necessary stock, defendants agreed to vote the stock as a unit. Subsequently, they sold their stock for $80 per share to a purchaser who then bought plaintiffs' minority stock interest for its book value of $50.20 per share. Plaintiffs claimed that defendants breached their fiduciary duty as corporate officers and directors by (1) surreptitiously acquiring a controlling interest and agreeing to vote as a unit and (2) failing to disclose offers they had received for the purchase of a controlling stock interest.

The Kansas court held that the voting agreement and acquisition of control violated no fiduciary duty and that defendants had no obligation to inform plaintiffs of any offers to purchase a majority stock interest. 1 Kan. App. at 488, 571 P.2d at 22-23. The court, adhering to the general rule that all stockholders may freely dispose of their stock, observed that the difference in value between the majority and minority stock interests was not evidence of fraud, as stock vesting control of a corporation is generally recognized to be worth more than a minority interest. *Id.* at 490, 571 P.2d at 24. *See also Claggett* v. *Hutchinson*, 583 F.2d 1259, 1263-64 (4th Cir. 1978) (seller of controlling shares was not required to afford minority shareholders the opportunity to sell their

shares on the same terms and conditions on which he sold his shares).

█ In the present case, the allegations in the amended motion for judgment fail to establish that defendants acted wrongfully in agreeing to vote their stock as a unit. It is apparent that members of the Glass and Potter families, except for Powell Glass, Jr., desired that ownership of the Corporation remain in those families. The will of Mary Archer Glass Boatwright recommended that all other assets of her estate be used to pay estate and inheritance taxes before selling her stock in the Corporation, and the will of Carter Glass, Jr., expressed the testator's belief that operation of the Corporation's newspapers should be continued under the management of his sons, Carter Glass, III, and Thomas R. Glass. Moreover, the letters that the majority shareholders sent to Thomas R. Glass and Potter expressed a desire to keep control of the Corporation in the Glass and Potter families. Individually or collectively, the shareholders could choose not to sell their stock.

When Gannett's representative approached Thomas R. Glass about purchasing stock in the Corporation, Glass told him that the owners of the majority stock would not sell and that if Gannett purchased plaintiffs' stock it would never acquire that of the majority. Plaintiffs say this was a threat to prevent Gannett from buying their stock. We construe it as no more than an accurate statement of the factual situation then existing, that the majority owners planned to retain their stock indefinitely and, if possible, permanently. As to the alleged promise by Glass that if Gannett did not buy plaintiffs' stock Gannett would be given the first option to purchase the majority's stock if it were sold, that may have expressed Glass's intention at that time. There is no allegation that Gannett ever sought to hold Glass to such a promise or that Gannett's interest in the Corporation even continued after the interview with Glass.

█ Plaintiffs alleged that defendants obtained unfairly low appraisals of the Corporation's stock owned by the estates of Mary Archer Glass Boatwright and Ria Thomas Glass by withholding pertinent information from the appraisers. Defendants could lawfully offer to buy plaintiffs' stock, in arms' length negotiations, at any price, regardless of appraisals or other offers. Nor was such an attempt to purchase improper even if it was motivated by a desire to eliminate dissident stockholders and to establish a low valuation of an estate's stock in the closely held Corporation.

Moreover, plaintiffs rejected defendants' offer to purchase their stock for the appraised price and there is no allegation that defendants used the appraisals again. Therefore, no damage resulted from the appraisals.

■ Plaintiffs further alleged that defendants did not fully inform the majority stockholders, who for the most part were inexperienced in business, of the consequences of their acting as a unit. Presumably, one of the consequences was the risk of litigation. In addition, plaintiffs alleged that defendants induced the majority shareholders to act jointly without explaining to them the actual value of stock in the Corporation. These allegations are insufficient to show that defendants used unlawful means to accomplish a lawful purpose. The letters that the majority stockholders sent to Thomas R. Glass and Potter expressed complete confidence in the management of the Corporation and a strong desire to keep control in the Glass and Potter families. It was consistent with these legitimate positions for the majority to agree to act together. The majority had a right to sell or not to sell. Although the exercise of the right not to sell might, and in this case did, result in the minority stockholders having to sell their stock at a discount, such a possibility is one of the inherent risks incident to ownership of a minority interest in a closely held corporation. The amended motion for judgment, therefore, did not allege use by the defendants of unlawful means to accomplish a lawful purpose.

■ We further hold that the amended motion for judgment failed to allege that defendants accomplished an unlawful purpose. There was nothing inherently unlawful in the combining of the majority stockholders to act as a unit. They did not prevent plaintiffs from selling their stock. The majority offered to buy the stock at an unreasonably low price but plaintiffs exercised their right to reject the offer.

Plaintiffs alleged that defendant officers and directors induced joint action only to protect their own positions in the Corporation in selfish disregard of the best interests of the majority, the minority, and the Corporation itself. The amended motion for judgment, however, failed to allege any specific wrongdoing prompted by these motives. Indeed, it is implicit that protection of the positions of defendant officers and directors was one of the purposes desired by the majority as expressed in their letters to the management in which they agreed to act jointly. Plaintiffs' allegations concerning their inability to sell their stock at a higher price appear to be

only a reflection of their dissatisfaction and disappointment with the discounted value of their minority interest. Their status as minority stockholders made it inevitable that plaintiffs, acting independently, would have difficulty in marketing their stock.

■ We hold that the allegations in the amended motion for judgment did not show that defendants acted together to accomplish a lawful purpose by unlawful means, or an unlawful purpose by lawful means. Consequently, the trial court correctly sustained the demurrer to the allegation of conspiracy to prevent plaintiffs from selling their stock at a fair price.

2. Interference with contractual relations.

Plaintiffs contend that the allegations of the amended motion for judgment show that defendants wrongfully interfered with their contractual relations with Howard. We disagree.

■ We have held that there is a cause for action for conspiracy to induce the breach of a contract. *Worrie* v. *Boze*, 198 Va. 533, 95 S.E.2d 192 (1956). Moreover, in *Allen Realty Corporation* v. *Holbert*, 227 Va. 441, 449, 318 S.E.2d 592, 597 (1984), in reversing a trial court which had sustained a demurrer to an amended motion for judgment, we held that an allegation of tortious interference with a prospective contract stated a cause of action. These cases are inapposite, however, to the present case. Howard did not contract with plaintiffs to buy additional stock. The contract provided for payment to plaintiffs of additional sums for their stock in the event Howard acquired specified additional stock from other stockholders. Unlike *Worrie*, there was no breach of contract. The prerequisites for additional payments were not met, but Howard had already consummated the contract to buy plaintiffs' stock at the original discounted price agreed upon. And there is no allegation, as in *Holbert*, that a prospective contract is involved.

■ Courts in other jurisdictions, however, have recognized a cause of action for interference with a prospective business or economic advantage even though no breach of contract was involved. Thus, the court in *Professional Investors Life Insurance Co.* v. *Roussel*, 528 F. Supp. 391, 399 (D. Kan. 1981), summarized the element of such a cause of action as follows: (1) the existence of a business relationship or expectancy, with a probability of future economic benefit to plaintiff; (2) defendant's knowledge of the relationship or expectancy; (3) a reasonable certainty that absent

defendant's intentional misconduct, plaintiff would have continued in the relationship or realized the expectancy; and (4) damage to plaintiff. *See Bowl-Mor Co.* v. *Brunswick Corp.*, 297 A.2d 61 (Del. Ch. 1972).

Such claims have also been recognized in cases involving at-will contracts. For example, in *Island Air, Inc.* v. *LaBar*, 18 Wash. App. 129, 566 P.2d 972 (1977), plaintiff gave to defendant confidential information about its company's at-will contract with a shipper with the understanding that defendant would use the information only to evaluate the possible purchase of the business. Using this information, however, defendant caused the shipper to terminate its contract with plaintiff. Affirming a judgment for plaintiff, the court said that the fact that the contract was terminated according to its terms did not defeat a claim based on unjustifiable interference since the contract would have continued in effect if defendant had not interfered. *Id.* at 140, 566 P.2d at 979. *See also Getschow* v. *Commonwealth Edison Co.*, 111 Ill. App.3d 522, 444 N.E.2d 579 (1982) (interference with at-will contracts sales representative had with building contractors); *Franklin* v. *Brown*, 159 So.2d 893 (Fla. Dist. Ct. App. 1964) (interference with real estate broker's business relationship with prospective purchaser).

In effect, plaintiffs contend that they had a business expectancy with Howard, that Russell knew of the expectancy, that absent Russell's misrepresentations, defendants and other stockholders would have sold to Howard, thereby enabling plaintiffs to recover the discount on their stock, and that they were damaged as a result of Russell's misconduct. Russell's alleged misconduct consisted of his misrepresentations to Robert S. Howard of the reasons for requesting that Howard's offer be extended for two weeks, his denial on two occasions that there was a competing offer, and his failure to inform Robert S. Howard, as requested, if any competing bids were received.

There is no allegation that Howard was coerced into extending the deadline for accepting its offer. Regardless of the reasons that Russell advanced for requesting the extension, the decision to extend was Howard's alone and Howard assumed voluntarily the risk that its offer would not be accepted. Russell's statement to Robert S. Howard that there were no competing offers was not incorrect in that the Worrell offer was not a firm bid; rather, it was conditioned on the prospective purchaser arranging necessary

financing. Russell represented two estates to which he owed a fiduciary duty to obtain the best price available for stock in the Corporation. It is apparent that in seeking the extension of time on Howard's bid, Russell hoped to get a higher bid, as indeed he succeeded in doing.

The beneficiaries of the estates represented by Russell might have complained about his failure to entice Howard and Worrell into competitive bidding by informing Howard of the Worrell offer. Plaintiffs alleged that Howard would have increased its offer to at least $92 per share had it known of Worrell's offer of $90 per share. But Russell was in a precarious position when with Howard's firm bid in hand and the extended deadline approaching he received a substantially higher firm bid from Worrell. The Howard bid included an employment contract for Thomas R. Glass for five years. The Worrell bid included a more favorable employment contract for Glass and employment contracts for three other defendant officers and directors. The amended motion for judgment alleged that defendants knew that Howard would never agree to such contracts. In view of the expressed desire that family members continue to manage the Corporation's newspapers, however, the employment contracts, while undoubtedly beneficial to the employees involved, were consistent with what the majority stockholders deemed to be in the best interest of the Corporation as well as themselves. Whether Russell was derelict in his fiduciary duties to the estate when he elected to accept the Worrell offer rather than risk the possibility of the withdrawal of both offers is irrelevant in the present case.

As for the plaintiffs, they had sold their stock to Howard and had no standing to object to the employment contracts. Plaintiffs alleged that defendants did not act with fidelity toward Howard, the minority stockholder, because of their determination to injure plaintiffs. Howard, however, was not a party plaintiff. There is no allegation that Howard sought redress as a stockholder for breach by defendant officers and directors of any duty to exercise good faith.

We agree with the trial court that under plaintiffs' theories, a minority stockholder could impose his will on the majority stockholders and force a sale contrary to the wishes of the majority. The majority stockholders had rights for which they were entitled to protection. They had the right to retain their stock, to control the management of the Corporation, and to act together to accom-

plish their legitimate aims. The action of plaintiffs in obtaining a firm offer from Howard for their stock forced the sale to an outsider of the controlling stock in the Corporation, contrary to the wishes of the majority stockholders. Plaintiffs, under economic pressure, precipitated the crisis in ownership by acting independently. They had the right to do so, but defendants also were free to deal with Howard, Worrell, or any other prospective purchaser, without notice to or approval of plaintiffs.

In deciding to sell to Worrell, just before the anticipated execution of the proposed contract with Howard, defendants did not tortiously interfere with plaintiffs' expectancy with Howard. The result of defendants' choice of Worrell as the purchaser was that plaintiffs did not receive money which would have been theirs if the choice had been Howard. This was an unfortunate, unexpected turn of events for plaintiffs; their dismay is understandable. Defendants are not liable for damages, however, when they acted within their rights, and not without just cause, in consummating the sale of the majority stock to Worrell. Their actions being lawful, whether they acted in a spirit of actual malice, hostility, or ill will toward plaintiffs is of no legal consequence. *See Childress* v. *Abeles*, 240 N.C. 667, 84 S.E.2d 176 (1954); *American Diversified Insurance Services, Inc.* v. *Union Fidelity Life Insurance Co.*, 439 So.2d 904 (Fla. Dist. Ct. App. 1983).

We will affirm the judgment of the trial court.

*Affirmed.*