**MEADOW LIMITED PARTNERSHIP, Plaintiff,**

v.

**HERITAGE SAVINGS AND LOAN ASSOCIATION, et al., Defendants.**

**Civ. A. No. 85–0634–R.**

United States District Court, E.D. Virginia, Richmond Division.

July 8, 1986.

James M. Minor, Jr., Ronald E. Kuykendall, Minor & Kuykendall, Richmond, Va., Stanley E. Preiser, Edward D. McDevitt, Preiser & Wilson, Charleston, W.Va., for plaintiff.

John D. Epps, John H. O'Brion, Jr., William D. Bayliss, Browder, Russell, Morris & Butcher, Richmond, Va., for defendants.

1. Meadow Limited named as defendants in this suit Heritage Savings and Loan Association, a state-chartered institution, as well as numerous individual defendants. Theodore W. Potter, in 1984, was the president of Heritage, and Elbert E. Smith, Jr., was senior vice-president and chief lending officer. Jay M. Weinberg was, and still is, Chairman of the Board of Directors of Heritage. He is also a partner in the Richmond law firm of Hirschler, Fleischer, Weinberg, Cox & Allen. William R. Baldwin, III, also a member of Hirschler, Fleischer, represented Heritage in connection with the foreclosure proceedings at Meadow Farm.

## MEMORANDUM OPINION

RICHARD L. WILLIAMS, District Judge.

This matter comes before the Court on the motion for summary judgment by defendants Heritage Savings and Loan Association, Jay M. Weinberg, Theodore W. Potter, Elbert E. Smith, Jr., and William R. Baldwin, III. The plaintiff, Meadow Limited Partnership ["Meadow Limited"], has accused the defendants of racketeering, fraud, conspiracy, and interference with contractual relations in connection with the foreclosure and resale of certain real property, known as the Meadow Farm, located in Caroline County, Virginia. For reasons stated below, the motion is GRANTED.

### I. The Factual Background.

The plaintiff, Meadow Limited, was organized to purchase and possibly to develop the Meadow Farm, which in 1979 consisted of 2,000 acres. Meadow Limited owned the Farm from 1979 to 1981, when it sold the core property, 857 acres, to Oran V. Jarrell and Associates, a Virginia general partnership. As it concerns this suit, the Farm is organized into two main parts, parcels A–E and parcels F–H. In the second half of 1983, Heritage Savings and Loan Association ["Heritage"][1] had unpaid and delinquent loans in the principal amount of more than $3.5 million outstanding to Jarrell. One of those loans, in the principal amount of $925,000, was secured by a second deed of trust on portions of the Meadow Farm, and a third deed of trust on the remainder of that property.[2] Additionally, a first

Meadow Limited also sued Eric, Ruben, and Eve Freedlander, who are mortgage bankers in Richmond. They are partners in the Meadow Farm Partnership, a Virginia general partnership. The plaintiff has voluntarily dismissed the Freedlander defendants from this case, although presently pending is the motion of these defendants for Rule 11 sanctions.

2. The second deed of trust was held on parcels A–E, while parcels F–H secured Heritage's third deed of trust.

deed of trust on another piece of land secured this loan.[3]

The first deed of trust on all 857 acres was held by the Federal Land Bank of Baltimore, securing a loan in the original principal amount of $1.5 million. Meadow Limited, the plaintiff, held a second deed of trust in the principal amount of $235,000. This deed of trust encumbered Parcels F through H and arose out of the 1981 sale of Meadow Farm to Jarrell.[4]

In January of 1984, Heritage purchased the Land Bank note, for the face value of principal and interest due, $742,648.81. This gave Heritage a first deed of trust on all parcels of Meadow Farm, a second deed of trust on Parcels A–E, and a third deed of trust on Parcels F–H (behind plaintiff's second deed of trust on Parcels F–H). At this time, the Land Bank note was in default and had been accelerated by the Land Bank. Heritage continued collection procedures, scheduling a foreclosure sale for April 18, 1984.[5]

The foreclosure took place as scheduled at the Caroline County Courthouse. Heritage purchased the property for $810,000.[6] At the auction, the trustee announced that he reserved a unilateral right of rescission for 48 hours.

Meanwhile, Jarrell was also attempting to sell Meadow Farm, in an effort to reduce his debts. During the winter of 1984, he met with representatives of a California joint venture entity, composed of the RKO Hotel Corporation and A. Cal. Rossi [hereafter "RKO/Rossi"]. On April 5, 1984, two weeks before the foreclosure, Jarrell met with RKO/Rossi representatives to discuss the sale of Meadow Farm. They then proceeded to the office of Jay M. Weinberg to make an offer. Weinberg is Chairman of the Board of Directors of Heritage. The proposal was that RKO/Rossi would purchase the Jarrell notes (held by Heritage) for $1.6 million. Heritage would immediately assign these notes to RKO/Rossi, but payment would be withheld for 90 days. Weinberg, in turn, stated that Heritage required an irrevocable letter of credit to secure the delayed payment. RKO/Rossi agreed, and Weinberg consented to present the proposal to the Heritage Executive Committee.

After this meeting, there came into being a document—the "April 5th document"—drafted and signed by RKO/Rossi and Jarrell. The plaintiff contends this is a contract for the sale of the Farm to RKO/Rossi by Jarrell. According to the document's terms, RKO/Rossi would give a non-interest bearing note to Jarrell for $400,000, and in exchange, Jarrell would transfer the Farm. This document made the RKO/Rossi obligations contingent upon (1) the written agreement of Heritage to the RKO/Rossi offer to purchase the two Jarrell notes (with payment 60 days following

---

3. This tract, the "Pottery Land," consisted of fifty-six acres in Hanover County. Heritage foreclosed on this land in March of 1984, since it also secured the $925,000 loan. The bank purchased this tract for $115,000 and, six months later, conveyed it to Eve and Ruben Freedlander for $550,000. Meadow Limited never had any interest in the Pottery property.

4. There also existed a subordinate lien on Meadow Farm, in the principal amount of $1.4 million. Little Oil Co. held this deed of trust to secure Jarrell debts which arose in connection with a truckstop he operated.

5. To handle the sale, Heritage retained Sam T. Beale, a Richmond lawyer with experience in conducting foreclosures, as substitute trustee under the deed of trust. The sale was advertised in *The Caroline Progress* and *The Richmond Times-Dispatch* newspapers. The plain-

tiff's agent, Janet K. Reese, became aware of the impending sale. The plaintiff retained McGuire, Woods & Battle to negotiate on its behalf concerning the disposition of the sale proceeds. Meadow Limited demanded that Heritage utilize the doctrine of "marshalling" to apply the foreclosure proceeds favorably to Meadow Limited. Heritage and Meadow Limited resolved this issue, in Meadow Limited's favor, five days before the sale.

6. At the auction, Beale initially offered the property for sale in two lots, and then as a whole, to see which method brought the best price. Parcels F–H were bid up to $240,000, and parcels A–E were bid up to $560,000. Reese, on behalf of Meadow Limited, bid $220,000 on parcels F–H and $550,000 on A–E. As for the property as a whole, Heritage was the only bidder at $810,000.

Heritage's acceptance); and (2) RKO/Rossi obtaining a suitable opinion letter on water, sewer, and zoning. In the contract, RKO/Rossi "acknowledges" that Jarrell owed Meadow Limited approximately $235,000, secured by a deed of trust on Meadow Farm. The plaintiff states that, by this term, "RKO/Rossi intended to pay that indebtedness to the plaintiff." RKO/Rossi also agreed to give Heritage "an irrevocable letter of credit for 1.6 million dollars to guarantee performance in purchasing of the aforementioned notes within 3 days after acceptance of their offer by Heritage Savings & Loan Association in writing." Neither Heritage nor Meadow Limited was a signatory to this agreement, and Heritage apparently never knew of its existence until the commencement of this suit. No representatives of Meadow Limited attended the April 5 meeting. None of the contingencies were ever satisfied, Heritage never accepted the offer, and RKO/Rossi never gave Heritage an irrevocable letter of credit.

Still, negotiations between Heritage on the one hand and RKO/Rossi and Jarrell, on the other, continued. The parties never arrived at a final agreement before April 18, and the foreclosure sale took place. Nonetheless, Heritage, as noteholder, had reserved a 48-hour unilateral right of rescission. And, as the successful bidder at the sale, Heritage also had the opportunity to sell outright. The parties continued to negotiate on the same terms after the sale as they had before.

On Thursday, April 19, 1984, Heritage by letter advised RKO/Rossi that it was still interested in consumating the deal. This letter required a response by April 20 and notified RKO/Rossi of Heritage's two preconditions to a sale of the note. These were a $1.6 promissory note from RKO/Rossi to Heritage, and an irrevocable bank letter of credit to secure the note. A hand-delivered letter on Friday, April 20, re-stated the offer, but noted that "if this transaction is not closed today, then this proposal shall be revoked and we will have to start over Monday." No letter of credit issued, and the offer—by its terms—expired.

Still, however, Heritage continued to negotiate with RKO/Rossi on the following Monday, April 23. That day, Eric Freedlander contacted Heritage representatives concerning the sale of Meadow Farm. The next day, he submitted a written, signed offer to buy the Farm. The Executive Committee of the Heritage Board of Directors met and decided to explore this proposal, as well as to continue dealing with RKO/Rossi. Also on the 24th, RKO/Rossi notified Heritage that it had deposited $1.6 million in an area bank. But this letter raised an additional condition by RKO/Rossi, that the Farm "be zoned Planned Use Development (PUD-1) instead of its present zoning of Agriculture (A-1)." On the 25th, Heritage counteroffered to Freedlander. He responded later that day but required Heritage's reply by the end of the day. Simultaneously, a Heritage representative met with RKO/Rossi to put a draft into writing. Heritage informed them that another offer had been made and again referred to the principal difficulties which prevented the instant deal from closing: the zoning contingency and the lack of security for the delayed payment. At the end of the day, Weinberg took a poll, by telephone, of the Executive Committee. No minutes of the Executive Committee reflect this solicitation. Pursuant to that poll, he notified Freedlander that Heritage accepted his proposal.

The following morning, Heritage informed RKO/Rossi that another offer had been accepted.

Meadow Limited never participated in these negotiations, and were not aware of the April 5 "contract" until a month after the foreclosure sale. Plaintiff's representative attended the foreclosure, made bids, and participated in the accounting afterwards. Meadow Limited did not object to the Commissioner of Accounts following the sale about the conduct of the foreclosure. Nor would it have succeeded in any protest, since the foreclosure was held in accordance with Virginia law.

Meadow Limited is now proceeding on several different theories, alleging violations of RICO (Count 1), the Virginia Business Conspiracy statute, Va.Code § 18.2–500 (Count 2), common law conspiracy (Count 3), common law fraud (Count 4), prima facie tort (Count 5), intentional tort (Count 6), aiding and abetting (Count 7), and tortious interference with contractual relations (Count 8).

## II. RICO.

The thrust of Meadow Limited's RICO claim is that the defendants participated in a scheme to defraud, in connection with the foreclosure and resale of the Meadow Farm. While there may well be a significant statute of limitations problem here,[7] the plaintiff's allegations do not show a "pattern of racketeering activity." [8]

"A violation of § 1962(c) ... requires (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co., Inc.,* —— U.S. ——, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985). The RICO statute defines a "pattern of racketeering activity" as "requir[ing] at least two acts of racketeering activity, one of which occurred after the effective date of this chapter ... and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5).

Many courts have wrestled with the pattern concept since the Supreme Court's opinion in *Sedima.* While the Court's holding did not address the pattern element of RICO, Justice White referred to the "failure of Congress and the courts to develop a meaningful concept of 'pattern'", *id.* 105 S.Ct. at 3287, and noted, in oft-cited language, that:

As many commentators have pointed out, the definition of a "pattern of racketeering activity" differs from the other provisions in § 1961 in that it states that a pattern *"requires* at least two acts of racketeering activity, § 1961(5) (emphasis added), not that it "means" two such acts. The implication is that while two acts are necessary, they may not be sufficient. Indeed, in common parlance two of anything do not generally form a "pattern." The legislative history supports the view that two isolated acts of racketeering activity do not constitute a pattern. As the Senate Report explained: "The target of [RICO] is thus not sporadic activity. The infiltration of legitimate business normally requires more than one 'racketeering activity' and the threat of continuing activity to be effective. It is this factor of *continuity plus relationship* which combines to produce a pattern." S Rep No. 91–617, p. 158 (1969) (emphasis added). Similarly, the sponsor of the Senate bill, after quoting this portion of the Report, pointed out to his colleagues that "[t]he term 'pattern' itself requires the showing of a relationship.... So, therefore, proof of two acts of racketeering activity, without more, does not establish a pattern...." 116 Cong Rec 18940 (1970) (statement of Sen. McClellan). See also id. at 35193 (statement of Rep. Poff) (RICO "not aimed at the isolated offender"); House Hearings, at 665. Significantly, in defining "pattern" in a later provision of the same bill, Congress was more enlightening: "crimi-

---

**7.** This Court held, in *HMK v. Walsey,* 637 F.Supp. 710, (E.D.Va.1986), that in Virginia RICO is subject to a one-year limitations period. Meadow Limited commenced this action on May 13, 1985, in state court, from which it was removed. As the foreclosure sale occurred on April 18, 1984, the plaintiff's claims appear to be barred by the statute of limitations. At this point in the proceedings, however, the Court concludes that there may be a material issue of fact concerning the accrual of plaintiff's causes of action. The Court therefore does not reach this issue and, accordingly, bases its RICO hold-

ing on the pattern element. As for the state law claims, the plaintiff has failed to produce evidence in support of certain crucial elements. *See n. 9 infra.*

**8.** Even assuming the truth of the allegations in plaintiff's complaint, the Court holds that the facts show no RICO pattern. In the face of the defendants' summary judgment motion, the Court's conclusion is buttressed by the absence of any facts demonstrating some sort of continuing racketeering activity.

nal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." 18 U.S.C. § 3575(e). This language may be useful in interpreting other sections of the Act. Cf. *Iannelli v. United States*, 420 U.S. 770 [95 S.Ct. 1284, 43 L.Ed.2d 616] (1975). *Sedima*, 105 S.Ct. at 3285 n. 14.

Justice Powell's dissent emphasizes that, in examining the 'pattern' requirement, "the presence of the predicate acts is only the beginning: something more is required for a 'pattern' to be proved." 105 S.Ct. at 3289. These words cannot be ignored, and "the Supreme Court's enhancement of the 'continuity' aspect of the pattern requirement casts doubt on the continued validity of cases which carve one criminal episode into multiple predicate act 'pieces' and allege a 'pattern' within the meaning of the statute." *Rush v. Oppenheimer & Co., Inc.*, 628 F.Supp. 1188, 1199 (S.D.N.Y. 1985).

■ When courts consider whether a complaint states a "pattern," *Sedima's* footnote 14 points them to the factors of "continuity plus relationship," both of which must be present to constitute a pattern. The relationship test requires that the pattern be connected with the predicate acts. "The required relationship will be different, depending upon the prohibited conduct.... [S]ection 1962(c) requires that predicate acts need only be related to the conduct of the affairs of the enterprise, not that they necessarily be closely related to each other.... The relationship requirement concerns the nexus between the predicate acts and the proscribed conduct." *Torwest DBC, Inc. v. Dick*, 628 F.Supp. 163, 166, 167 (D.Colo.1986). In *Superior Oil v. Fulmer*, 785 F.2d 252, 257 (8th Cir. 1986), the Eighth Circuit interpreted the relationship requirement to mean that the predicate acts were "in pursuit of" the alleged pattern of racketeering activity. The Court finds that the acts Meadow Lim-

ited contends constitute a pattern are indeed related to each other and the pattern. This aspect of the pattern requirement is satisfied. The Court holds, however, that there is not sufficient continuity to establish a RICO pattern.

Several courts have interpreted the continuity factor as requiring some separation or differentiation among the predicate racketeering acts. *E.g., Medallion TV Enterprises, Inc. v. SelecTV of California*, 627 F.Supp. 1290 (C.D.Cal.1986) (pattern of racketeering activity must include racketeering activity sufficiently unconnected in time or substance to be considered as separate criminal episodes); *Allington v. Carpenter*, 619 F.Supp. 474 (C.D.Cal.1985) (same). Other courts have gone further, stating that multiple fraudulent acts committed in pursuit of a single fraudulent scheme cannot form a pattern. *E.g., Fleet Management Systems v. Archer-Daniels-Midland Co.*, 627 F.Supp. 550 (C.D.Ill.1986) (a single scheme to market computer software, consisting of at least eight fraudulent acts over a two year period, was not a pattern); *Northern Trust Bank/O'Hare, N.A. v. Inryco, Inc.*, 615 F.Supp. 828 (N.D. Ill.1985) (multiple fraudulent mailings in furtherance of one scheme did not constitute a pattern). On the other hand, several courts have held that multiple schemes are not necessary to form a pattern. *E.g., Trak Microcomputer Corp. v. Wearne Brothers*, 628 F.Supp. 1089 (N.D.Ill.1985) (pattern established with respect to a single fraudulent scheme); *Graham v. Slaughter*, 624 F.Supp. 222 (N.D.Ill.1985) (same). Finally, there are those courts which have refused to accept *Sedima's* invitation to develop the pattern concept. *R.A.G.S. Couture, Inc. v. Hyatt*, 774 F.2d 1350 (5th Cir.1985) (two related predicate acts of mail fraud constitute a pattern).

Confronted with such a diverse array of judicial opinion, the Court agrees with Judge Wright and is "loath to adopt a definition of pattern which turns on an assessment of whether one or multiple criminal schemes is involved. Such a definition would be highly susceptible to ma-

nipulative semantics." *Paul S. Mullin & Associates, Inc. v. Bassett,* 632 F.Supp. 532, 541 (D.Del.1986). Rather, in determining whether a pattern of racketeering exists, the key focal points are "continuity plus relationship." And, in evaluating these factors,

> Courts should look to the purposes, results, participants, victims and methods of commission to determine whether a pattern of racketeering activity exists. The number of predicate acts, if more than one, is irrelevant. The question is the nature of the conduct under all of the circumstances.

*Torwest DBC, Inc. v. Dick,* 628 F.Supp. 163, 165 (D.Colo.1986).

Furthermore, one can never forget the underlying purposes of RICO when considering whether a given factual scenario forms a RICO pattern. "RICO was an aggressive initiative to supplement old remedies and develop new methods for fighting crime," *Sedima,* 105 S.Ct. at 3286, and Congress intended RICO to bar the infiltration of legitimate businesses by organized crime and to separate racketeers from their profits. *Russello v. United States,* 464 U.S. 16, 26–28, 104 S.Ct. 296, 302–03, 78 L.Ed.2d 17 (1982). The pattern requirement, especially its continuity aspect, neatly dovetails with this purpose. Among other things, continuity indicates whether a defendant's conduct is something more than isolated (i.e., non-racketeering criminal activity). "[T]he inquiry should be concerned with whether the conduct establishes a reliable sample of traits or other observable features that can be said to constitute a pattern of behavior." *Torwest,* 628 F.Supp. at 165. As one court stated,

> The obvious purpose of the continuity plus relationship formulation is to narrow the "pattern" concept to reach RICO's intended goal—enterprises which utilize similar methods of operation and participants and whose victims are harmed in similar manners by the operation of the particular racket. It is this kind of a continuous ongoing enterprise that poses the "threat of continuing criminal activity" and it is this kind of enter-

prise that civil RICO has as its primary target.

*Fleet Management Systems v. Archer-Daniels-Midland Co.,* 627 F.Supp. 550, 559 (D.C.Ill.1986).

Not surprisingly, given the attractiveness of RICO's treble damages and attorneys fees, plaintiffs often include RICO counts in run-of-the-mill commercial cases, such as this one. Many courts have considered similar facts and, just as unsurprisingly, have not found a RICO pattern to be present. In *Torwest DBC v. Dick,* 628 F.Supp. 163 (D.Colo.1986), the plaintiff alleged that directors of a corporation, acting as individuals, secretly bought real property and resold it at a substantial profit to the corporation. The court found "only one purpose, one result, one set of participants, one victim and one method of commission." As a result, there was "no continuity and ... no pattern of racketeering activity." *Id.* at 166. In *Lipin Enterprises, Inc. v. Lee,* 625 F.Supp. 1098 (N.D.Ill. 1985), the RICO plaintiff purchased all of the stock in two companies. It sued the seller, as well as certain banks and their directors, alleging a scheme to defraud by which the defendants induced the plaintiff to buy at an inflated price. The court held that twelve separate predicate acts did not form a pattern, as there was no continuity sufficient to evidence continuing criminal activity. *Allright Missouri, Inc. v. Billeter,* 631 F.Supp. 1328 (E.D.Mo.1986), involved the transfer of land from one limited partnership to another. Since all of the alleged actions were undertaken with the single purpose of accomplishing this one transfer, no pattern existed. *Id.* at 1330. *See also Morgan v. Bank of Waukegan,* 615 F.Supp. 836 (N.D.Ill.1985).

◼ At bottom, the case at bar is no different. It involves only a single transaction. Throughout the course of events, the cast of characters remained the same, as did the purpose, result, and alleged victim. The Court can discern no indicia of ongoing criminal activity, the hallmark feature of a RICO pattern. There is no evidence of

other similar activities by Heritage or any other defendant. At most, this is an instance of isolated or sporadic activity, not significant enough to implicate RICO.

In short, this was a one-shot deal. Heritage held the first deed of trust on a parcel of real property, for which payments were in default. It foreclosed on the property, purchased it at a legitimately-conducted auction, and resold it seven days later. During this time span, Heritage negotiated in good faith with two interested purchasers, finally choosing one over the other. This series of events does not establish a RICO pattern. It may have involved a number of allegedly fraudulent acts, but it does not evidence any threat of continuing racketeering activity or the involvement of an organized criminal enterprise.

### III. State Law Claims.

Remaining are the state law claims, to which the Court now turns. Even though the Court has disposed of the federal question claim, it will exercise its pendent jurisdiction over the remaining claims. *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). To do otherwise would waste judicial resources, frustrate the convenience of the parties, and encourage piecemeal litigation. To avoid unnecessary repetition, the Court will approach these claims in their logical order.[9]

In Count VIII, Meadow Limited asserts a claim for tortious interference with contractual relations. The basis for this claim is that the defendants "prevented Jarrell from performing its contractual obligations to RKO/Rossi." Meadow Limited lays claim to this cause of action as the third-party beneficiary of an alleged contract, arising out of the April 5 document, between RKO/Rossi and Jarrell.[10] In Virginia, the elements of this tort are:

(1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted.

*Chaves v. Johnson*, 230 Va. 112, 335 S.E.2d 97, 102 (1985). Heritage argues that no contractual relationship existed between RKO/Rossi and Jarrell. Meadow Limited

---

9. At this point, the Court should note the different approach it takes with the state law counts. Whereas the "pattern" question was decided almost on the same standard as a Fed.R.Civ.P. 12(b)(6) motion to dismiss, the state law claims require the application of Fed.R.Civ.P. 56's standard. In this connection, the Court takes note of the recent Supreme Court pronouncements on the use of summary judgment. *Anderson v. Liberty Lobby, Inc.*, — U.S. —, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, — U.S. —, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986):

at the summary judgment state the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.... [T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

*Anderson*, — U.S. at —, 106 S.Ct. at 2511 (citations omitted).

As applied to the state law claims, the plaintiffs have failed to come forth with evidence showing any genuine issues of material fact. All of these claims have some scienter requirement, and the plaintiffs have failed to establish any factual dispute concerning the defendant's "evil" motives. There is thus no "genuine" dispute as to a material fact. *Id.* at —, —, 106 S.Ct. at 2510; *see also Celotex Corporation*, — U.S. at —, 106 S.Ct. at 2554 ("the burden on the moving party may be discharged by 'showing'—that is, pointing out to the District Court—that there is an absence of evidence to support the nonmoving party's case").

10. The Court has doubt as to whether Meadow Limited has the requisite standing to assert this claim. Meadow Limited did not even know of the RKO/Rossi negotiations until the middle of May, 1984. Nor was Meadow Limited a party to the purported agreement. Under these circumstances, the Court suspects that even if Meadow Limited is a third-party beneficiary of the agreement, it lacks standing to raise the claim. In other words, it had no legitimate business expectancy that RKO/Rossi would pay the note, since it had no knowledge of the contract's existence.

contends that there was a business expectancy, of which Weinberg knew, since he attended the April 5 meeting.

The document was drafted after the meeting, and Heritage was not a signatory. No one present at the meeting has affirmatively stated that the signatories/participants informed Heritage of any intent to pay Meadow Limited's second deed of trust. Indeed, the Heritage defendants did not know of the "contract's" existence until this lawsuit was filed. From the record, the Court concludes that there simply was no knowledge of this contract by the defendants.

■ More to the point, Heritage did not act with the requisite motive to impose liability. Heritage had, at all times, the absolute freedom to sell to RKO/Rossi the notes, on whatever terms it thought advisable. Even if Heritage had full knowledge of the RKO/Rossi-Jarrell deal, it still had absolute control of the situation, since it held the priority lien. The note was in default and had been accelerated. That April 5 agreement was contingent on Heritage accepting the RKO/Rossi offer to purchase the notes relating to the first deed of trust. While Virginia does not require malice for this cause of action, *Chaves*, 335 S.E.2d at 102–03, there must be an "intentional, improper interferance with another's contractual relations." *Allen Realty Corp. v. Holbert*, 227 Va. 441, 318 S.E.2d 592, 597 (1984). In this case, even assuming that Meadow Limited can assert this claim, the Court can find no indicia that Heritage improperly interfered in the contractual affairs of others. This is particularly true where the contract purportedly interfered with contains an explicit contingency predicated on Heritage's actions.

■ In count IV, Meadow Limited asserts a fraud cause of action, alleging that the defendants induced the plaintiff not to take action to protect its interests at the foreclosure sale. A fraud claim requires the intentional misrepresentation of a material fact with the intent to mislead. *Winn v. Aleda Construction Co., Inc.*, 227 Va. 304, 315 S.E.2d 193, 195 (1984).[11] The record is entirely clear that Heritage informed RKO/Rossi that failure to provide a bank letter of credit would result in the holding of the foreclosure sale. RKO/Rossi may have been under a mistaken impression, stemming from their high expectations and the negotiations' quick pace, that the sale was off. Nonetheless, they were informed the night preceding the sale, that it would take place in the morning.

■ As to the plaintiff itself, its agent attended the sale and bid. Prior to the sale, plaintiff's law firm had negotiated with Heritage concerning the disposition of the sale proceeds. Meadow Limited participated in the accounting after the sale. Assuming any sort of misrepresentation, there was no reliance on them by Meadow Limited. Heritage, then, cannot be liable for fraud. *Hershfang v. Knotter*, 562 F.Supp. 393, 397 (E.D.Va.1983), *aff'd without opinion*, 725 F.2d 675 (4th Cir.1984) ("having proved nonreliance, defendants cannot be liable for common law fraud"). And, since plaintiff never knew of RKO/Rossi before the sale, it could not have been misled by any statements made to RKO/Rossi. In Virginia, the party misled must rely on the misrepresentation and be damaged by it, *Winn*, 315 S.E.2d at 195, a showing Meadow Limited cannot make.

■ The second count of Meadow Limited's complaint seeks to impose liability on the Heritage defendants for violations of the Virginia business conspiracy statute, Va.Code § 18.2–500. To prevail on this ground, the plaintiff must show "(1) a combination of two or more persons for the purpose of willfully and maliciously injuring plaintiff in his business, and (2) resulting damage to plaintiff." *Allen Realty*

---

**11.** The plaintiff must prove fraud by clear and convincing evidence. *Id.* The Court's inquiry at the summary judgment stage includes this substantive evidentiary standard of proof. *Anderson v. Liberty Lobby, Inc.*, —— U.S. ——, ——,

106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986). The record is devoid of contested facts by which Meadow Limited can survive a properly-made and supported summary judgment motion under this standard.

*Corp. v. Holbert*, 227 Va. 441, 318 S.E.2d 592, 596 (1984).

Meadow Limited contends that the Heritage defendants conspired to prevent Jarrell and RKO/Rossi from consumating their contract. By doing so, the plaintiff argues, Heritage would receive the benefit of the entire $1.6 million, without the plaintiff receiving its *pro rata* share. As part of this "conspiracy," Meadow Limited maintains that the Heritage defendants prevented RKO/Rossi from showing up at the auction.

But these arguments fail in the face of the undisputed facts, which show no conduct motivated by willful and malicious intent. Heritage conducted its affairs in an entirely legitimate fashion. The RKO/Rossi-Jarrell deal was contingent on Heritage's acceptance. The negotiations' track record demonstrates that RKO/Rossi never came to Heritage's terms, and Heritage refused RKO/Rossi's terms. An inability to agree does not always flow from evil animus.

Plaintiff's allegations are just that—allegations. Meadow Limited and Heritage negotiated over the distribution of the sale proceeds. Heritage remained willing to deal with RKO/Rossi after the sale on nearly the same terms as before the sale. The record discloses no misrepresentation by Heritage to prevent RKO/Rossi's attendance at the sale: it shows more of a mistaken misunderstanding by RKO/Rossi that the parties had reached a deal, when, in fact, they had not. The Court's prior conclusions as to interferance with contract and fraud apply with equal force here, that Heritage cannot be found liable on this theory.

■ Count three of the complaint alleges a cause of action for common law civil conspiracy. "A civil conspiracy is a combination of two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means, resulting in damage to the plaintiff." *Glass v. Glass*, 228 Va. 39, 321 S.E.2d 69, 74 (1984). There must be "some concerted action, to accomplish some criminal or unlawful purpose, not in itself criminal or unlawful, by criminal or unlawful means.... There can be no conspiracy to do an act which the law allows." *Hechler Chevrolet, Inc. v. General Motors*, 230 Va. 396, 337 S.E.2d 744, 748 (1985). As has already been explained, there was no unlawful purpose or unlawful act. The defendants' actions were entirely legal in scheduling the foreclosure sale, conducting it, and later reselling the property.

■ Finally, the plaintiff has alleged several causes of action not expressly recognized by the state courts of the Commonwealth. These are *prima facie* tort (relying on *Cartwright v. Golub Corp.*, 51 A.D.2d 407, 381 N.Y.S.2d 901 (1976)), intentional tort (relying on Restatement (Second) of Torts § 871), and aiding and abetting (relying on Restatement (Second) of Torts § 876). Although the Virginia Supreme Court has not recognized these various claims, this Court must still pass on them, applying state law. *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). If state law is unclear or unsettled, a federal court must determine the rule that the state Supreme Court would probably follow, not fashion a rule which an independent federal court might consider best. *Swiatlowski v. State Farm Mutual Automobile Insurance Co.*, 585 F.Supp. 965 (W.D.Va.1984). In this regard, the Court assumes *arguendo* that Virginia would recognize these causes of action. Plaintiff still fails, at the summary judgment phase, to establish any claim to relief on them.

■ To prevail on a claim for a *prima facie* tort, plaintiff must show, *inter alia*, that the defendant intentionally inflicted harm upon the plaintiff, without excuse or justification. *Cartwright*, 381 N.Y.S.2d at 902. The defendant's action must be based on malice and personal animus. *John C. Supermarket, Inc. v. New York Property Insurance Underwriting Ass'n*, 60 A.D.2d 807, 400 N.Y.S.2d 824 (1978). "[T]he malicious motive must be the sole motive," *Rodgers v. Grow-Kiewit Corp.-MK*, 535 F.Supp. 814 (S.D.N.Y.1982), *aff'd without*

*opinion,* 714 F.2d 116 (2d Cir.1982), and where "other motives exist, such as profit, self-interest, or business advantage, *prima facie* tort does not lie." *Roberts v. Pollack,* 92 A.D.2d 440, 461 N.Y.S.2d 272, 276 (1983). Heritage merely tried to recoup as much as it legally could from the defaulted loans to Jarrell.

 The Court once again finds Heritage's actions to have been proper and justified. In the commercial real estate world, the rules permit the playing of hardball: there is no prohibition against tough bargaining. Heritage acted in accordance with its perceived best interests and this Court cannot find any legal scaffolding upon which to hang a bank for conducting a legitimate foreclosure and resale of real property: "economic self-interest motives and the interest of improving one's power and position ... are inconsistent with the requirement of a solely malicious motive." *Rodgers,* 535 F.Supp. at 817.

As for the intentional tort stated in Restatement (Second) of Torts § 871, it generally appears to be the same animal as a *prima facie* tort, and courts have used the two interchangeably. *E.g., Tufts v. Madesco Investment Corp.,* 524 F.Supp. 484, 486 (E.D.Mo.1981) (referring to § 871 as a *prima facie* tort). The Court fears repeating itself, suffice it to say that the elements of this tort are not made out. The record is bare of evidence to show any improper motives on the part of Heritage. *See id.* ("the doctrine is applicable only when the factual basis of the complaint does not fall within the parameters of an established tort"); Restatement (Second) of Torts § 871 comments a & b (requiring a "culpable and unjustifiable act" by the defendant).

Finally, Meadow Limited attempts to state a claim under Restatement (Second) of Torts § 876 (Persons Acting in Concert). The Court again cannot discern any theory upon which these defendants can be held liable. *Cf. Frankel v. Wyllie & Thornhill, Inc.,* 537 F.Supp. 730, 744 (W.D. Va.1982) (requiring at least a scienter requirement of recklessness); *In re Investors Funding Corp,* 523 F.Supp. 533, 542 (S.D.N.Y.1980) ("aider and abetter liability may not be imposed when the fraud is not a direct or reasonably foreseeable consequence of the reckless conduct").

For the foregoing reasons, the defendants' motion for summary judgment is GRANTED. An order will issue in accordance with this opinion. Let the Clerk send a copy of this opinion to all counsel of record.