558

## CIRCUIT COURT OF BEDFORD COUNTY

Ronald L. Willard,
on behalf of
Moneta Building Supply, Inc.,
and all its shareholders

v.

Moneta Building Supply, Inc.,
A. S. Cappellari,
Rose Mary Cappellari,
David L. Cappellari,
and Capps Home and
Building Center, Inc.

May 14, 1998

Case No. CH97018259-00

BY JUDGE JAMES W. UPDIKE, JR.

I have carefully considered the evidence presented during the trial of the captioned matter and reviewed the statements of authority submitted by counsel.

Upon my application of relevant statutes and case law to the facts as I have determined them as trier of fact, Counts I, II, III, IV, V, VI, and VII of plaintiff's Amended Bill of Complaint are dismissed for reasons of insufficient evidence and plaintiff's failure to sustain his required burden of proof.

Upon my application of § 13.1-672.5(1) of the Code of Virginia to the facts as I have determined them, I do not find that this proceeding has resulted in substantial benefit to the corporation. Plaintiff's request for reasonable expenses, including counsel fees, and costs incurred in this proceeding is therefore denied. Moreover, I do not find that this proceeding was "commenced or maintained arbitrarily, vexatiously or not in good faith" as provided in pertinent part by § 13.1-672.5(2). The defendants are therefore denied reasonable expenses, including counsel fees, and costs incurred in defending this proceeding.

## Opinion

This proceeding was instituted as a derivative proceeding pursuant to § 13.1-672.1 of the Code of Virginia and filed by the plaintiff, Ronald L. Willard, on behalf of Moneta Building Supply, Inc., (hereinafter MBS) and all its shareholders. The plaintiff owns approximately 20% of the common stock of MBS; defendant A. S. Cappellari owns approximately 50% of the common stock; defendant Rose Mary Cappellari owns approximately 25% of the common stock; and David L. Cappellari owns approximately 5% of the common stock of MBS. Capps Home and Building Center, Inc., is a named defendant as a result of its having purchased the assets of MBS pursuant to an Asset Purchase Agreement.

When stating the reasons for my decision, I will not recite at length the facts of this case. A summary of the evidence from the perspective of each party can be found in the numerous pleadings and briefs that were filed in this proceeding. Moreover, as can be seen from these documents, much of the evidence is not in dispute. The issues of controversy, both from a factual and legal perspective, are essentially limited to the fairness of the price paid for MBS's assets and the conduct of the parties immediately preceding the sale. As I address each count of plaintiff's Amended Bill of Complaint, I will state my understanding of the applicable law and the salient facts that are most relevant to my decision.

*Count I: Derivative Claim for Breach of Fiduciary Duties (Against Defendants A. S. Cappellari and Rose Mary Cappellari)*

A. *Va. Code § 13.1-724*

Count I alleges that defendants A. S. Cappellari and Rose Mary

Cappellari breached their fiduciary duties to MBS during the sale of the assets of MBS to defendant Capps Home and Building Center, Inc. When discussing this allegation, I feel it appropriate to begin with a review of § 13.1-724 of the Code of Virginia since this is the statute that governs the sale of a corporation's assets.

Section 13.1-724(A) provides in pertinent part that a "corporation may sell … all, or substantially all, of its property, otherwise than in the usual and regular course of business on the terms and conditions and for the consideration determined by the corporation's Board of Directors, if the Board of Directors adopts and its shareholders approve the proposed transaction."

The statute further states two requirements for the authorization of a proposed transaction, the first of which is stated as follows:

> The Board of Directors shall submit the proposed transaction to the shareholders with its recommendation unless the Board of Directors determines that because of conflict of interest or other special circumstances it should make no recommendation and communicates the basis for its determination to the shareholders with the submission of the proposed transaction.

Section 13.1-724(B)(1).

The second requirement for authorization of the sale of a corporation's assets is, in the context of this case, approval "by the holders of more than two-thirds of all the votes entitled to be cast on the transaction." Section 13.1-724(E). Paragraph D of the statute provides for notification to each shareholder of the proposed shareholders' meeting.

A special meeting of the shareholders of MBS was held on December 20, 1996, to consider and vote upon an Asset Purchase Agreement submitted pursuant to an offer by defendant Capps Home and Building Center, Inc. There was no dispute in the evidence as to notice of the meeting having been given (Exhibit 14), or received (Exhibit 27A, letter acknowledging plaintiff's receipt), and no dispute as to approval of the sale of the assets by holders of more than two-thirds of the votes entitled to be cast on the issue. (Exhibit 17.)

There was, however, a dispute at trial concerning the action taken by the Board of Directors when approving the Asset Purchase Agreement during its special meeting on November 19, 1996. There was also a dispute at trial as to the adequacy of the notice of the special meeting of the shareholders on December 20, 1996, rather than the fact of notification.

I will first address the special meeting of the Board of Directors on November 19, 1996. At that time, defendant David L. Cappellari had resigned

as an officer and director of MBS, having previously submitted a letter to that effect dated September 18, 1996. (Exhibit 2.) The plaintiff had also resigned as an officer and director of MBS as shown by his letter of resignation dated October 7, 1996. (Exhibit 5.) Consequently, on November 19, 1996, the defendants A. S. Cappellari and Rose Mary Cappellari were the only remaining directors of MBS.

At trial, the plaintiff seemed to question whether the Board of Directors of MBS ever met on November 19, 1996, and suggested that defendant Rose Mary Cappellari did not attend this meeting and had perhaps returned to West Virginia because of her strained relationship with her son, defendant David L. Cappellari. The plaintiff presented no persuasive evidence to support this suggestion. The defendants, however, presented evidence through the testimony of Mrs. David L. Cappellari and defendant A. S. Cappellari that Mrs. Rose Mary Cappellari did not leave Bedford County to return to West Virginia until the Saturday after Thanksgiving. This special meeting of the Board of Directors was held in the residence of A. S. Cappellari and Rose Mary Cappellari, and it may be reasonably inferred that Mrs. Cappellari would have had ample opportunity to attend a meeting in her own home. The minutes of this special meeting (Exhibit 9) indicate that Rose Mary Cappellari was present, and the minutes are signed by her as Secretary of MBS. The greater weight of the evidence therefore supports a factual finding that Rose Mary Cappellari was present during the meeting of November 19, 1996; that she and A. S. Cappellari met as the two remaining members of the Board of Directors; and that the procedural requirements of § 13.1-724 were met in this regard. I emphasize that I am only addressing at this point the corporate formalities concerning the meeting of the Board of Directors to consider the Asset Purchase Agreement. Plaintiff's substantive allegations concerning the manner in which the Board of Directors acted, such as the allegations of breach of fiduciary duty, conspiracy, and conflict of interest, will be addressed in the order raised by plaintiff's Amended Bill of Complaint.

The plaintiff argued at trial that the Board of Directors violated § 13.1-724(B)(1) when the directors submitted the proposed transaction to the shareholders without recommendation and that the notice of the special meeting of the shareholders on December 20, 1996, (Exhibit 14) was inadequate in this respect.

As already stated, § 13.1-724(B)(1) provides:

> The Board of Directors shall submit the proposed transaction to the shareholders with its recommendation unless the Board of Directors determines that because of *conflict of interest* or *other special*

*circumstances* it should make no recommendation and communicates the basis for its determination to the shareholders with the submission of the proposed transaction.

(Emphasis added.)

The plaintiff argued at trial that defendants A. S. Cappellari and Rose Mary Cappellari had a conflict of interest with defendant David L. Cappellari and therefore defendant Capps Home and Building Center, Inc. The plaintiff also encouraged the court to find that there was an inherent conflict of interest because the defendant David L. Cappellari is the son of defendants A. S. Cappellari and Rose Mary Cappellari. I decline to adopt such a rule of a *per se* conflict of interest arising merely from a familial relationship and rule instead that the existence of a conflict of interest must be determined upon an examination of all the attendant circumstances. I will discuss in more detail plaintiff's allegation of conflict of interest when addressing Count IV of plaintiff's Amended Bill of Complaint and my application of § 13.1-691 of the Code of Virginia to the facts of this case. For the purposes of this analysis, I will state that the evidence does not support a factual finding of a conflict of interest between defendants A. S. Cappellari and Rose Mary Cappellari and defendant Capps Home and Building Center, Inc., and to the extent that "other special circumstances" existed, they were sufficiently disclosed to the shareholders to allow submission of the proposed transaction without recommendation.

The notice of the special meeting of the stockholders on December 20, 1996, states as follows:

> You are hereby further notified that Mr. A. S. Cappellari, President, Director, and shareholder of Moneta Building Supply, and Mrs. Rose Mary Cappellari, Vice President, Director, and shareholder of Moneta Building Supply, are familial relatives to David L. Cappellari, President and sole shareholder of Capps Home and Building Center, Inc.

(Exhibit 14.)

In addition to the above-stated disclosure in the notice, I emphasize that MBS is a closely held corporation with only four shareholders. The evidence in the record well establishes the long personal and professional relationship between the plaintiff and the defendants, the successes that they achieved together, and the difficulties they experienced over the years with one another, some of which have resulted in prior litigation before this court. All parties knew of the familial relationship, and I rule that the requirements of § 13.1-

724 concerning submission of the proposed transaction to the shareholders without recommendation were satisfied.

Plaintiff also argued at trial that the Asset Purchase Agreement acted upon by the Board of Directors on November 19, 1996, was not the same Asset Purchase Agreement upon which the shareholders voted on December 20, 1996. Therefore, plaintiff argues, the action of the shareholders on December 20, 1996, should be declared void.

Paragraph (C) of § 13.1-724 provides: "The Board of Directors may condition its submission of the proposed transaction on any basis."

The minutes of the special meeting of the Board of Directors on November 19, 1996, state that upon unanimous vote, the President of MBS was authorized to sign the Asset Purchase Agreement, "reserving the right to negotiate the Sellers' Representations contained in paragraph 4 of the Asset Purchase Agreement, and any other matters of concern to the shareholders." (Exhibit 9.) The original Asset Purchase Agreement was revised to make allowances for certain non-operating assets, including marketable securities. I rule that this revision was within the reserved right to negotiate and that the action of the Board of Directors and the subsequent vote of the shareholders were valid.

It is therefore my opinion that the corporate formalities for the sale of a corporation's assets, as provided by § 13.1-724 of the Code of Virginia, were satisfied.

B. *Va. Code § 13.1-690*

The plaintiff further alleges that defendants A. S. Cappellari and Rose Mary Cappellari violated their fiduciary duties to MBS. When analyzing an act of a closely held corporation such as MBS, a corporation in which the directors are also the majority shareholders, care must be taken to differentiate the duties owed by individuals in their capacity as directors from their duties as shareholders. Because these duties are different, I will separately discuss the actions of defendants A. S. Cappellari and Rose Mary Cappellari as directors, and then discuss their actions as majority shareholders.

Secondly, I feel it appropriate to exercise considerable care when identifying and applying the standard of conduct for a director of a corporation. Section 13.1-690 of the Code of Virginia states the general standards of conduct for a director, and paragraph A of this statute provides in pertinent part: "a director shall discharge his duties as a director … in accordance with his good faith business judgment of the best interests of the corporation." Section 13.1-690 further provides explicit procedures by which "good faith business judgment" is to be defined.

Since the General Assembly enacted this statute in 1985, there have been relatively few published opinions interpreting this statute. To the extent such opinions are available, I have found them very instructive. However, cases which were decided before the enactment of this statute and cases which interpret and apply the common law or other statutes are obviously much less instructive on this issue though such cases may be very instructive in other respects. The common law remains in effect in Virginia except to the extent it has been changed or modified by statute. As stated by the United States District Court for the Western District of Virginia, Section "13.1-690 was a radical departure from the common law and statutory business judgment standards." *W.L.R. Foods, Inc. v. Tyson Foods, Inc.*, 155 F.R.D. 142 (W.D. Va. 1994), aff'd 65 F.3d 1172 (4th Cir. 1995), cert. denied, 116 S. Ct. 921, 133 L. Ed. 2d 850 (1996).

Section 13.1-690 states as follows:

A. A director shall discharge his duties as a director, including his duties as a member of a committee, in accordance with his good faith business judgment of the best interests of the corporation.

B. Unless he has knowledge or information concerning the matter in question that makes reliance unwarranted, a director is entitled to rely on information, opinions, reports or statements, including financial statements and other financial data, if prepared or presented by:

1. One or more officers or employees of the corporation whom the director believes, in good faith, to be reliable and competent in the matters presented;

2. Legal counsel, public accountants, or other persons as to matters the director believes, in good faith, are within the person's professional or expert competence; or

3. A committee of the Board of Directors of which he is not a member if the director believes, in good faith, that the committee merits confidence.

C. A director is not liable for any action taken as a director, or any failure to take any action, if he performed the duties of his office in compliance with this section.

D. A person alleging a violation of this section has the burden of proving the violation.

A series of cases known as the *W.L.R. Foods* cases provide an extensive discussion of § 13.1-690. Because these cases are among the few which

discuss this statute, I wish to quote several statements from those decisions that I find particularly persuasive.

In this regard, the United States District Court for the Western District of Virginia stated:

> As Tyson argues, the traditional business judgment rule is represented by cases like *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946 (Del. 1985), which heretofore has been acknowledged in this district as an appropriate standard. *C-T of Virginia, Inc. v. Barrett*, 124 Bankr. 689 (W.D. Va. 1990). This court cannot help but observe, however, that *C-T of Virginia* was decided under Virginia law predating the enactment of § 13.1-690, and it believes, as W.L.R. suggests, that § 13.1-690 was a radical departure from the former common law and statutory business judgment standards. Clearly the court in *C-T of Virginia* was correct to the extent that it adopted a business judgment rule similar to that in *Unocal*, but because its operative facts predated the change of the statute, *C-T of Virginia* is of little precedential authority on the issue here presented.

*W.L.R. Foods, Inc. v. Tyson Foods*, 155 F.R.D. 145 (W.D. Va. 1994). The court went on to state:

> The court concurs with W.L.R.'s observations that § 13.1-690 is process-oriented in that it permits inquiry into the process by which the decision was made rather than the substance of the information processed by the director in making the business decision. To that extent, the court rejects Tyson's argument that traditional business judgment rule jurisprudence, as represented by such cases as *Unocal* and *C-T of Virginia*, applies in this case so as to prevent Tyson to inquire about the substance of the advice received by a director from the sources mentioned in this statute. The question is not what some person external to the transaction, and looking at it with perfect hindsight, might believe to have been an exercise of reasonably good or bad judgment based on the substance of advice given. Rather, "good faith" under the statute represents the question whether a *process* was engaged that would produce a defensible business decision. The procedural soundness of a business decision may be assessed by examining the qualifications of the persons with whom the director consulted, the general topics, not the substance, of the information sought or imparted and, in this court's view even whether the advice was followed.

*Id.*

When reviewing the above-cited decision by a United States Magistrate Judge, the United States District Court Judge stated:

The court finds that the appropriate reading of the law is the one that the Magistrate Judge has supplied. The court is struck by the fact that when it enacted § 13.1-690, the General Assembly generally chose to follow the lead of the Model Business Corporation Act except with regard to the Model Act's reasonableness standard for judging the propriety of director conduct. Compare Model Act 8.30(a) with Va. Code Ann. § 13.1-690. *See* Daniel T. Murphy, *The New Virginia Stock Corporation Act: A Primer*, 20 U. Rich. L. Rev. 67, 104-09 (1985). This signals legislative rejection of a substantive evaluation of director conduct, that is, evaluation in terms of the rationality of the conduct. Instead, courts are required to find some other indicia of "good faith business judgment of the best interests of the corporation," which is the standard to which directors are now held pursuant to § 13.1-690.

For the most part, the statute provides this indicia in subsection B, which creates something of a safe harbor for directors who rely on competent advice. § 13.1-690(B). This suggests that good faith is to be measured by the directors' resort to an informed decision making process, not by the rationality of the decision ultimately taken. Of course, resort to the process must itself be undertaken in good faith: the directors must believe in good faith that their advisors are competent to render the advice sought, and they must be aware of no facts which would make reliance on that advice unwarranted.

*W.L.R. Foods, Inc. v. Tyson Foods, Inc.*, 857 F. Supp. 492 (W.D. Va. 1994).

Obviously, § 13.1-690 is process-oriented, and "good faith," as it pertains to the conduct of a director, is to be measured by the extent to which the director engaged an informed decision making process. Indeed, the plaintiff, in his trial brief, admits that a director is required to engage an informed decision making process. However, the plaintiff argues that this standard only applies to the decision of whether to sell the assets of a corporation or not sell such assets. According to the plaintiff, once the decision to sell the assets has been made, the director has a duty to obtain the highest price for the shareholders. In support of this position, the plaintiff cites *Revlon, Inc. v. McAndrews and Forbes Holdings, Inc.*, 506 A.2d 173 (Del. 1986). However, the decision in *Revlon* is based upon the law in Delaware, and not based upon § 13.1-690 of the Code of Virginia. As previously cited from *W.L.R. Foods,*

"§ 13.1-690 was a radical departure from the former common law and statutory business judgment standards." The plaintiff also cites *C-T of Virginia, Inc. v. Barrett*, 124 Bankr. 689, 692 (W.D. Va. 1990), as further support for the proposition that a director has a duty to obtain the highest price for the shareholders when selling a corporation. Once again, as stated by the court in *W.L.R. Foods*, "because its operative facts predated the change of the statute, *C-T of Virginia* is of little precedential authority on the issue here presented." *W.L.R. Foods, Inc. v. Tyson Foods, Inc.*, 155 F.R.D. 142 (W.D. Va. 1994).

In accordance with this statute, a director, when engaging in an informed decision making process, may rely upon such information as that provided by legal counsel, public accountants, or other qualified persons, unless he has knowledge or information concerning the matter which makes reliance unwarranted. If a director complies with this process, paragraph C of this statute provides him a "safe harbor" and an exception to liability. As stated in *W.L.R. Foods*, "the General Assembly has insulated not only the directors, but the actions they have taken, so long as those actions were taken pursuant to § 13.1-690." 857 F. Supp. 492. In this regard, the Supreme Court of Virginia has stated with reference to the standards of conduct described in Code § 13.1-690, that "a 'safe harbor' is provided to a director who does comply with those standards." *Commonwealth Transport. Comm'r v. Matyiko*, 253 Va. 1, 6 (1997). *See Curley v. Dahlgren Chrysler-Plymouth-Dodge, Inc.*, 245 Va. 429, 433 (1993).

Paragraph B of § 13.1-690 provides that a "person alleging a violation of this section has the burden of proving the violation." In this regard, the Supreme Court of Virginia has stated that, absent a conflict of interest, "a party challenging the actions of the Board of Directors has the burden of proving that the challenged action was not undertaken in accordance with the Director's good faith business judgment of the best interests of the corporation." *Izadpanah v. Boeing Joint Venture*, 243 Va. 81, 83 (1992).

It is now appropriate to discuss whether defendants A. S. Cappellari and Rose Mary Cappellari, as directors of MBS, followed an informed decision making process during the events preceding the sale of the assets of MBS. I will attempt to discuss these events chronologically and I emphasize that the burden is on the plaintiff to prove that an informed decision making process was not engaged.

Exhibit 61 is a report prepared by James T. Shepherd, a Certified Public Accountant, and dated July 15, 1996. The report is addressed to Amerigo S. Cappellari and states that it was prepared pursuant to Mr. Cappellari's request. In his report, Mr. Shepherd estimates the fair value of MBS to be $2,008,300.

This estimation includes $240,900 as the value of marketable securities that were owned by MBS but not purchased pursuant to the subsequent Asset Purchase Agreement. When the stated value of the marketable securities is subtracted, this report places a value of $1,767,400 on the remaining assets of MBS. The report also states that the estimate of fair value "does not take into consideration any discounts for marketability or minority interests." (Exhibit 61.) Obviously, at this point in time, no consideration is given to the financial impact of a competing building supply business opening in the immediate area as later suggested by defendant David L. Cappellari.

On September 18, 1996, defendant David L. Cappellari resigned as officer and director of MBS. (Exhibit 2.) In his letter of resignation, defendant David L. Cappellari states: "during the next several months, I intend to explore the option of opening my own building supply business." (Exhibit 2.) The letter is addressed to the plaintiff and defendants A. S. Cappellari and Rose Mary Cappellari. As of this date, at the very latest, all parties were aware of the possibility of defendant David L. Cappellari opening a business that would be in direct competition with MBS.

On October 7, 1996, the plaintiff called a special meeting of the stockholders of MBS. The plaintiff and defendants A. S. Cappellari, Rose Mary Cappellari, and David L. Cappellari were present during this meeting. According to the minutes of the meeting, plaintiff asked defendant David L. Cappellari "how long he had been looking for a new site and if he had chosen one." (Exhibit 5.) Plaintiff also asked defendant David L. Cappellari "how long he had been planning to leave the company." (Exhibit 5.) Defendant David L. Cappellari declined to discuss "any of his current or future plans." (Exhibit 5.) Also, according to the minutes of this meeting, plaintiff offered to sell his stock in MBS for $1,000,000. Because plaintiff owned approximately 20% of the stock, an extrapolation of this offer would value the total stock of MBS at $5,000,000. "No action was taken in this matter." (Exhibit 5.)

The minutes of the meeting on October 7, 1996, further state: "David Cappellari stated that depending on what direction the company was going to take, he may be interested in purchasing the assets of Moneta Building Supply, Inc." (Exhibit 5.) During his testimony at trial, plaintiff disputed the accuracy of these minutes and testified that defendant David L. Cappellari only indicated interest in buying *some* of the assets of MBS. Defendant A. S. Cappellari, during his testimony at trial, confirmed the accuracy of the minutes as written. Despite this factual conflict, all parties were aware on October 7, 1996, that defendant David L. Cappellari was considering as an option the purchase of some, if not all, of MBS's assets. When plaintiff "was asked if he

would be interested in purchasing the assets, he said that he was not interested." (Exhibit 5.) Therefore, according to the minutes of this meeting, which I find to be the better evidence, on October 7, 1996, defendant David L. Cappellari was possibly interested in purchasing the assets of MBS. Plaintiff was not.

On October 7, 1996, defendant A. S. Cappellari asked Bill Johnson, the accountant for MBS, to provide defendant David L. Cappellari with certain financial information concerning MBS. On October 8, 1996, defendant David L. Cappellari and MBS entered into a Confidentiality Agreement. (Exhibit 62.) At this point in time, defendant David L. Cappellari was a stockholder of MBS, and because of the executed Confidentiality Agreement, and the information that was then available concerning who was interested in purchasing the assets of MBS and who was not, in my opinion, defendant A. S. Cappellari did not breach his fiduciary responsibilities to MBS by providing this financial information to defendant David L. Cappellari as a potential purchaser of the assets of the company. Indeed, as testified at trial, companies regularly provide such information, in confidence, to potential purchasers.

On October 16, 1996, the plaintiff filed an action in this court pursuant to § 13.1-747 of the Code of Virginia requesting dissolution of MBS and a preliminary injunction. This was the second petition for dissolution of MBS filed by the plaintiff, the first being a counterclaim to the Motion for Declaratory Judgment filed by defendants David L. Cappellari, A. S. Cappellari, and Rose Mary Cappellari in this court on September 9, 1994. A hearing on the second Petition for Dissolution and Injunctive Relief was held before this Court on October 24, 1996. During this hearing, the plaintiff testified that "[a]fter Dave announces his opening and comes out of the ground, you can pretty much shut it down by about a third right then." (Transcript of 10/24/96 hearing at 97.) The only reasonable interpretation of the stated testimony of the plaintiff is that the plaintiff believed that competition from a building supply business owned and operated by defendant David L. Cappellari would reduce the value of MBS by a third. At the conclusion of this hearing, this Court denied plaintiff's request for an injunction.

In mid-October 1996, defendant David L. Cappellari retained the services of Hope Player, a Certified Public Accountant, to provide an evaluation of MBS.

On October 16, 1996, defendant David L. Cappellari received a commitment from the First National Bank of Altavista for a loan to open a new building supply business. (Exhibit 55.)

On November 13, 1996, Hope Player submitted her report in which she states "that the fair market value of Moneta Building Supply, Inc., is $1,300,000 as of September 30, 1996." (Exhibit 8 at p. 2.)

By letter dated November 15, 1996, Bruce C. Stockberger, legal counsel for defendant Capps Home and Building Center, Inc., submitted the Asset Purchase Agreement executed by defendant Capps Home and Building Center, Inc., which was defendant David L. Cappellari's new corporation, to J. Lee Osborne, legal counsel for defendants A. S. Cappellari and Rose Mary Cappellari. (Exhibit 6.) Obviously, defendants A. S. Cappellari and Rose Mary Cappellari were represented by legal counsel during this process. Indeed, the plaintiff did not contest at trial whether there was such legal representation. Rather, plaintiff argued at trial that defendants A. S. Cappellari and Rose Mary Cappellari improperly delegated their fiduciary duties as directors to legal counsel, a point that I will subsequently address. It is sufficient at this point to state that § 13.1-690(B)(2) permits reliance upon legal counsel, absent knowledge or information that makes such reliance unwarranted.

The letter of transmittal dated November 15, 1996, states that the defendant David L. Cappellari "has made arrangements for bank financing to provide the cash required to close this transaction if it is approved by the Board and stockholders." (Exhibit 6.) The letter also states that the "offer shall expire if not accepted by November 23, 1996. Time is of the essence." (Exhibit 6.) Attached to the Asset Purchase Agreement was the report prepared by Hope Player and Associates, dated November 13, 1996. (Exhibit 8.) Also attached to the Asset Purchase Agreement was Exhibit A, a legal description of the real property upon which MBS was situated, as prepared by a surveyor; Exhibit B, a balance sheet of Moneta Building Supply as of September 30, 1996; and Exhibit C, a reference to the pending suit requesting dissolution of MBS that was initiated by plaintiff.

On November 19, 1996, a special meeting of the Board of Directors of MBS was held at the residence of defendants A. S. Cappellari and Rose Mary Cappellari. As previously discussed, Mr. and Mrs. Cappellari were present and acted as the two remaining directors of MBS. The minutes of this meeting state:

The directors reviewed the evaluation of Moneta Building Supply by Hope Player and Associates and the proposed Asset Purchase Agreement, whereupon the directors were unanimous in deciding that the offer appeared on its face to be reasonable and one that if accepted by the shareholders of Moneta Building Supply, Inc., would be in their best interests.

(Exhibit 9.)

Defendant A. S. Cappellari testified at trial that throughout this process he had the services of legal counsel and relied upon their advice. Defendant A. S. Cappellari further testified at trial that when evaluating the report submitted by Hope Player, he considered the balance sheet of MBS as of September 30, 1996. When considering this balance sheet, he followed the following process, in accordance with his experience: he went to the listed total assets of MBS ($1,644,959.35) and subtracted the listed total current liabilities ($287,428), arriving at a balance of $1,357,531.35. Defendant A. S. Cappellari testified that this amount of total stockholders' equity was very close to the amount of the purchase price provided by the Asset Purchase Agreement.

As previously discussed, the directors voted unanimously to accept the offer, and to direct the President to sign the Asset Purchase Agreement, subject to the reserved right of negotiation, and to submit the offer to the shareholders with no recommendation. (Exhibit 9.)

The minutes of this meeting further state:

> The next item of business to come before the meeting was a decision whether to hire an independent Certified Public Accountant or other valuation expert to evaluate whether the valuation report reflects fair market value of the assets of Moneta Building Supply to be purchased and whether the offer from Capps Home and Building Center, Inc., is consistent therewith and upon motion duly made and seconded, the directors voted unanimously to do so.

(Exhibit 9 at p. 2.)

In accordance with this action of the Board of Directors, Dr. Larry Lynch subsequently submitted a report dated December 12, 1996, which was an independent evaluation of the report prepared by Hope Player. (Exhibit 13.) This report was submitted to all shareholders in advance of the special meeting of the shareholders on December 20, 1996.

On November 21, 1996, Bruce C. Stockberger, as counsel for defendant Capps Home and Building Center, Inc., submitted a revised Asset Purchase Agreement to J. Lee Osborne, as counsel for defendants A. S. Cappellari and Rose Mary Cappellari. (Exhibit 10.) Again, the involvement and participation of legal counsel is noted. This revised Asset Purchase Agreement made adjustments for the marketable securities owned by MBS and the assumption by the purchaser of MBS's accounts payable. Defendant A. S. Cappellari testified at trial that these adjustments did not significantly affect the proposed

purchase price, and as I have previously ruled, these adjustments were within the reserved right to negotiate.

On November 22, 1996, notice was given to all shareholders of the special meeting of the shareholders of MBS on December 20, 1996. (Exhibit 14.) The purpose of this meeting was to allow the shareholders to consider and vote upon the proposed Asset Purchase Agreement, and the purpose of the meeting and the procedures for the meeting were set forth in detail. At the conclusion of the notice, the following is stated: "If you have any questions or concerns you are invited to contact Mr. J. Lee Osborne, counsel for the undersigned, A. S. Cappellari, President of MBS." (Exhibit 14.) Again, I find documentary corroboration of defendant A. S. Cappellari's testimony of the involvement of legal counsel throughout this process.

By letter dated December 10, 1996, and addressed to defendants A. S. Cappellari and Rose Mary Cappellari, the plaintiff offered "to purchase the assets described in the Asset Purchase Agreement dated November 15, 1996, for the same amount provided for in that Asset Purchase Agreement plus $400,000.00." (Exhibit 27A.) The letter requested a "response to this offer not later than 3:00 p.m. on December 13, 1996." (Exhibit 27A.) This date was seven days in advance of the special meeting of the shareholders of MBS.

On December 12, 1996, Dr. Larry Lynch issued his report concerning the fair market value of MBS and his evaluation of the Asset Purchase Agreement. Dr. Lynch determined the effective purchase price in the Asset Purchase Agreement to be $1,316,947. Through the use of several methods, he determined different values for MBS ranging from $1,357,531 to $1,449,746, with an average value of $1,389,604. This average value was therefore $72,657 higher than the effective purchase price in the Asset Purchase Agreement. Nevertheless, Dr. Lynch stated:

> However, taking into consideration the fact that the going concern assumption may be affected by the loss of key personnel and pending litigation, it is the opinion of the author that … the total effective purchase price of $1,316,947 … is a fair and reasonable offer for [MBS] based on information available as of September 30, 1996.

(Exhibit 13.)

On December 13, 1996, the plaintiff filed another Bill of Complaint in this court requesting judicial dissolution of MBS and an injunction to prevent the special meeting of the shareholders on December 20, 1996. A hearing was held before this Court on this Bill of Complaint on December 17, 1996, and this court denied plaintiff's request for an injunction.

By letter dated December 19, 1996, and addressed to defendants A. S. Cappellari and Rose Mary Cappellari, the plaintiff offered "to pay $600,000 more than Capps for the same assets as set forth in the November 15, 1996, Asset Purchase Agreement." (Exhibit 20.)

On December 20, 1996, a special meeting of the shareholders of MBS was conducted to consider and vote upon the Asset Purchase Agreement pursuant to the earlier notice. Present during this meeting were the plaintiff and defendants A. S. Cappellari and David L. Cappellari, and defendant A. S. Cappellari held the proxy of defendant Rose Mary Cappellari. Therefore, the holders of all issued and outstanding shares of stock in MBS were either present or represented. All parties to this proceeding, including the defendant MBS, were represented by legal counsel and all such counsel were present. Defendant A. S. Cappellari as President of MBS presided over the meeting. The minutes of this meeting state that the valuation reports prepared by Hope Player and Dr. Larry A. Lynch had been previously provided to all shareholders. (Exhibit 17.) Defendant A. S. Cappellari stated that the "approximate value of the corporation under the Agreement is $1,300,000." (Exhibit 17.) The minutes further state:

A. S. Cappellari stated that the offer to purchase was considered by the Board of Directors of the corporation, which, finding it to be reasonable and fair on its face, resolved to sign the agreement in order to preserve the offer for consideration by the shareholders, the agreement itself being subject to shareholder approval. The Board referred the agreement to the shareholders for consideration without recommendation.

(Exhibit 17.)

According to the minutes, A. S. Cappellari further "stated that Dr. Lynch's opinion confirmed that the offer by Capps was reasonable and fair." (Exhibit 17.)

During the following discussion of the Asset Purchase Agreement, defendant A. S. Cappellari acknowledged plaintiff's offer to purchase MBS on the same terms as the Asset Purchase Agreement plus an additional $600,000. Defendant A. S. Cappellari also acknowledged an offer from plaintiff's counsel by which the plaintiff offered to sell his stock in MBS for a price of $800,000. After discussion of the Asset Purchase Agreement and the two offers made by the plaintiff, defendant A. S. Cappellari "then declared a recess of the meeting so that all parties concerned could consult with their respective counsel." (Exhibit 17.) Again, there is documentation of legal

counsel having provided their advice throughout this entire process. Following the recess, defendant A. S. Cappellari called for a vote on the issue of the ratification of the Asset Purchase Agreement. The plaintiff voted against the motion, defendant A. S. Cappellari voted in favor of the motion, and also voted the shares of defendant Rose Mary Cappellari, pursuant to written proxy, in favor of the motion. Defendant David L. Cappellari abstained from voting. The Asset Purchase Agreement was therefore accepted by a vote of more than two-thirds of all the votes entitled to be cast on the issue of sale of the assets of MBS.

The evidence presented at trial clearly demonstrates that defendants A. S. Cappellari and Rose Mary Cappellari, as directors of MBS, engaged in an informed decision making process that would produce a defensible business decision, as required by § 13.1-690 of the Code of Virginia, and as that statute is interpreted by the previously discussed decisions in *W.L.R. Foods*. Throughout the process that is required by § 13.1-724 for the sale of a corporation's assets, the defendants were represented by legal counsel. Defendant A. S. Cappellari testified that he relied upon the opinions of his counsel, as permitted by § 13.1-690(B)(1), and this testimony was substantially corroborated by other testimony and certain exhibits. The directors further relied upon the opinions of Certified Public Accountants, namely Hope Player and Dr. Larry Lynch. The directors also relied upon the information contained in the balance sheet of MBS and by following the process described by defendant A. S. Cappellari (subtracting total current liabilities from total current assets), the directors arrived at a figure generally consistent with the purchase price provided in the Asset Purchase Agreement.

What is more important, however, is not what the evidence demonstrates, but rather, what the evidence does not demonstrate. The plaintiff has the burden of proving that the defendants A. S. Cappellari and Rose Mary Cappellari did not engage in an informed decision-making process that would result in a defensible business decision. This he has failed to do.

There remains the issue of the good faith of the directors. As stated previously, a director may rely upon the information and opinions of certain experts, and may claim the benefit of the "safe harbor" provision of § 13.1-690(C), unless he has knowledge or information that makes such reliance unwarranted. § 13.1-690(B). In this regard *W.L.R. Foods*, states:

> Of course, resort to the process must itself be taken in good faith: the directors must believe in good faith that their advisors are competent to render the advice sought, and they must be aware of no facts which would make reliance on that advice unwarranted.

*W.L.R. Foods, Inc. v. Tyson Foods, Inc.*, 857 F. Supp. 496 (W.D. Va. 1994).

If one were to set aside the process-oriented requirements of § 13.1-690, the most troubling aspect of this case would become the question of why the directors did not accept plaintiff's offer of an additional $600,000. No one at trial suggested that plaintiff was not financially capable of paying such a price. In the context of § 13.1-690, this issue bears only upon the good faith of the directors and the extent to which their reliance on the opinions of experts was warranted. It is not the prerogative of the court to substitute its opinion for that of the directors or to decide with the benefit of hindsight what I feel the best decision would have been.

As stated previously, it is my opinion that § 13.1-690 alters previous case law that required a director to maximize profits and to accept the highest bid when selling the assets of a corporation. Section 13.1-690 requires a director to act in accordance with "his good faith business judgment of the best interests of the corporation." In this regard, it is my opinion that a director may consider not only the quantity of an offer to purchase assets, but the quality of the offer. Moreover, the best interests of a corporation may not always be served by accepting the highest price for assets.

The plaintiff alleges in his amended Bill of Complaint the following:

> In voting in favor of the sale, A. S. Cappellari stated that he considered not only the best interests of MBS and its stockholders in evaluating Capps' offer, but that he also considered the best interests of MBS's employees and customers as well. This was improper and was a breach of his duties to MBS and its shareholders. (Amended Bill of Complaint, pp. 12-13.)

I disagree with plaintiff's allegations and believe that a director, when acting in good faith and in the best interests of a corporation, may consider such factors and is possibly required to do so under certain circumstances. The decision rendered by the Supreme Court of Virginia in *Glass v. Glass*, 228 Va. 39, 321 S.E.2d 69 (1984), predates passage of § 13.1-690 and therefore may be of questionable precedential authority as it pertains to general standards of conduct for a director of a corporation. Nevertheless, there is a statement in *Glass* that was partially quoted by both the plaintiff and the defendants. The statement, in its entirety, is as follows:

> The sale of a majority stock interest by an officer or director may result in a breach of his fiduciary duty, however, if the circumstances indicate that *the purchasers will loot or mismanage the corporation*, or if the sale involves fraud, misuse of confidential information,

wrongful appropriation of corporate assets, or personal use of a business advantage that rightfully belongs to the corporation.

228 Va. at 48 (emphasis added).

If, under *Glass*, an officer or director could be held liable for breach of fiduciary duty when selling his majority stock interest if the purchasers will loot or mismanage the corporation, then it necessarily follows that a director, under the same circumstances, must consider when selling a majority stock interest whether the purchasers will loot or mismanage the corporation. Failure to do so would violate his fiduciary duty.

In the context of this case, I believe this statement from *Glass* has applicability to a director's good faith business judgment of the best interests of the corporation, and it is immaterial that *Glass* involved the sale of stock and this case involves the sale of assets. The requirement of good faith on the part of a director, as opposed to a shareholder, remains the same. Therefore, it is my opinion that the defendant A. S. Cappellari, in the exercise of good faith business judgment, could legitimately consider, as stated in the minutes of the special shareholders' meeting on December 20, 1996, "the best interests of the employees of the corporation as well as other non-monetary factors including the business's customers, continuity of management, and the realistic threat to the corporation from competition if the property were not sold to Capps." (Exhibit 17 at p. 2.) A corporation consists of people, and as Dr. Bonomo testified, the smaller the corporation, the more important the people are. Not only could defendant A. S. Cappellari consider the welfare of the employees of the corporation, but he could also consider the relationship of the customers to the corporation. Such relationships constitute a valuable asset of a corporation, and in fact in this instance an amount of $175,000 was paid for such good will. In this regard, the minutes of the special meeting of the shareholders on December 20, 1996, state: "Mr. Willard stated his opinion that if you split up the component parts of the business and offered them to bid to individuals in the trade, that the average price for the equipment, real estate, and business would be well in excess of Dave's offer." (Exhibit 17 at p. 2.) A reasonable interpretation of this statement would be that the plaintiff intended to split the corporation, sell the component parts, and thereby dissolve the corporation.

In exercising good faith business judgment, the defendant A. S. Cappellari could legitimately consider, as he testified at trial, the number of lawsuits instituted by the plaintiff against MBS and the number of times that the plaintiff requested that MBS be dissolved. Moreover, the minutes of the meeting on December 20, 1996, indicate that the plaintiff offered to sell his

stock for a price of $800,000. When extrapolating this offer from a basis of plaintiff's 20% interest, a value is placed on the total stock of $4,000,000 and a value of $3,000,000 is placed upon the 75% interest owned by defendants A. S. Cappellari and Rose Mary Cappellari. When defendant A. S. Cappellari offered to sell his shares and the shares of his wife at the same rate offered by the plaintiff, the plaintiff declined comment. As previously discussed, plaintiff declined comment in response to a similar offer by defendant A. S. Cappellari to sell his shares during the meeting on October 7, 1996.

Essentially, defendant A. S. Cappellari testified at trial that he questioned the sincerity of plaintiff's offers and the motivation for plaintiff's offers. It is not necessary for me to state an opinion in this regard. Rather, it is my opinion that the plaintiff has failed to prove that the defendants A. S. Cappellari and Rose Mary Cappellari failed to exercise good faith business judgment of the best interests of the corporation and failed to prove that their reliance on the information and opinions of certain experts was unwarranted. Furthermore, for the reasons already stated, I find that plaintiff has failed to prove that the reliance of the defendant was reliance in blind faith as prohibited by *Sandburg v. Virginia Bankshares, Inc.*, 891 F.2d 112 (4th Cir. 1989).

The plaintiff also argued that the defendant A. S. Cappellari violated his fiduciary duties as a director of MBS by improperly delegating his duties to his attorneys. In my opinion, the plaintiff has failed to prove as a matter of fact that such delegation occurred. Rather, it is my opinion that the defendant A. S. Cappellari relied upon the opinions of legal counsel and, for the reasons already stated, such reliance is permitted by § 13.1-690.

The plaintiff also argued that the defendant Rose Mary Cappellari violated her fiduciary duties as a director of MBS by improperly delegating her duties to her husband. In support of this argument, the plaintiff presented at trial testimony from an earlier deposition given by defendant Rose Mary Cappellari. In this deposition, defendant Rose Mary Cappellari does indeed make statements concerning relinquishment to her husband of the decision concerning the sale of the assets of MBS. Further evidence established, however, that Mrs. Cappellari was extremely distraught because of the decision of her son, defendant David L. Cappellari, to leave MBS. Other evidence established that she was hospitalized during the month of December 1996, and during the period immediately preceding the special meeting of the shareholders on December 20, 1996. Moreover, when the evidence is viewed in its entirety, it is not clear whether Mrs. Cappellari was addressing her duties as director of MBS or was confused concerning the proxy she granted to her husband as a shareholder of MBS. Nevertheless, Mrs. Cappellari stated in her deposition that she was convinced that her husband would act in the best

interests of MBS. In this regard, § 13.1-690(B)(1) permits a director of a corporation to rely upon information and opinions of "[o]ne or more officers or employees of the corporation whom the director believes, in good faith, to be reliable and competent in the matters presented." Again, such reliance is permitted unless it is unwarranted. Therefore, § 13.1-690 would permit Mrs. Cappellari, as director, to rely upon the information and opinions of her husband, unless she had knowledge or information which would make such reliance unwarranted. The plaintiff has the burden of proving such unwarranted reliance, and in this instance, proving an improper delegation of authority. It is my opinion that the plaintiff has failed to do this.

Consequently, the allegations stated in Count I of plaintiff's amended Bill of Complaint are allegations against defendants A. S. Cappellari and Rose Mary Cappellari in their capacity as directors of MBS. In a closely held corporation such as MBS in which the directors are also the majority shareholders, individuals, as directors, are held to one standard of conduct, but as shareholders, they are held to another standard. To emphasize this distinction, I feel it appropriate to address the actions of defendants A. S. Cappellari and Rose Mary Cappellari as shareholders.

As already discussed at length, directors must comply with the general standards of conduct set forth in § 13.1-690. Directors owe certain fiduciary duties to the corporation, but shareholders are not held to these same standards. The shareholders own the corporation, and in this regard, they have certain rights and responsibilities. Section 13.1-747, a statute with which the parties to this proceeding are well familiar, provides certain protection to shareholders from conduct that is illegal, oppressive, fraudulent, or wasteful. When addressing the predecessor to this statute, the Supreme Court of Virginia stated:

> It provides an additional remedy for the protection of the rights of stockholders, particularly minority stockholders. This remedy is in addition to the rights theretofore afforded stockholders under both the State law and the corporation's charter and bylaws.

*Baylor v. Beverly Book Co.*, 216 Va. 22, 24 (1975). Having these rights, it necessarily follows that shareholders have the responsibility of not acting in a manner that would violate § 13.1-747.

Short of violating § 13.1-747, it is my opinion that shareholders own their stock and they can vote their stock. In this regard, I find *Glass* to be particularly instructive. Though plaintiff argued that *Glass* pertains to the sale of stock rather than the sale of assets, I find this distinction to be material only to the extent of distinguishing the duties of directors and shareholders. To the

extent that each owes duties to the corporation, these duties apply equally, in my opinion, to instances of selling stock and selling assets. Moreover, the effective date of § 13.1-690 has no bearing on the applicability of *Glass* to the conduct of a shareholder since § 13.1-690 applies only to directors.

In *Glass*, the Supreme Court of Virginia stated: "In general, shareholders may dispose of their stock as they see fit." 228 Va. at 48. Regarding the actions of the majority stockholders in *Glass*, the Supreme Court stated:

> The majority had a right to sell or not to sell. Although the exercise of the right not to sell might, and in this case did, result in the minority stockholders having to sell their stock at a discount, such a possibility is one of the inherent risks incident to ownership of a minority interest in a closely held corporation.

228 Va. at 50.

After affirming the trial court's ruling of sustaining the defendants' demurrer in *Glass*, the Supreme Court described the actions of the defendants as follows: "Their actions being lawful, whether they acted in the spirit of actual malice, hostility, or ill will towards plaintiffs is of no legal consequence." 228 Va. at 54.

In this case, I rule that when defendant A. S. Cappellari voted his shares of stock and the shares of stock of his wife by proxy in favor of the Asset Purchase Agreement, he did not act as a shareholder in a manner that was illegal, oppressive, fraudulent, or wasteful. Experts testified at trial for both the plaintiff and the defendants concerning the value of the assets of MBS. I found each expert impressive in his or her own regard and felt that I was able to follow and understand their testimony and the questions of counsel. Each expert defended his or her opinion in a manner that was consistent with a defensible business judgment. Nevertheless, I heard opinions of the value of the assets of MBS ranging from approximately $800,000 as testified by Dr. Bonomo, to a value of $5,000,000 as initially stated by the plaintiff. The wide discrepancy in valuation often depended upon the method utilized by the expert and the extent to which the expert viewed, as a financial impact, the consequences of a competing business and the loss of key personnel. Surprisingly, from my perspective, even appraisals of the value of the real estate varied dramatically.

I will not substitute my judgment for the judgment of the directors and shareholders of MBS. However, in the context of this ruling, I will state that I am not convinced by the greater weight of the evidence that the purchase price provided in the Asset Purchase Agreement and approved by the majority

shareholders of MBS, resulted in fraud, oppression, or waste to the corporation or its shareholders.

I also feel it important, but not determinative, that when acting as directors, defendants A. S. Cappellari and Rose Mary Cappellari submitted the Asset Purchase Agreement to the shareholders without recommendation, thereby distinguishing their actions as directors from those as shareholders.

Having found no illegality on the part of defendants A. S. Cappellari and Rose Mary Cappellari in their capacity as shareholders, it is my opinion that they owned their stock and could vote their stock. As stated in *Glass*, there are certain inherent risks in being a minority stockholder in a closely held corporation and the plaintiff in this case has realized the consequences of those risks, much to his understandable disappointment and frustration. However, though the plaintiff had hoped to acquire a larger percentage of the stock of MBS through his Stock Purchase Agreement, as long as he remained a minority stockholder, the risks of his predicament were not unknown to him, and as he testified at trial, "business is business."

Consequently, Count I of plaintiff's Amended Bill of Complaint is dismissed for reasons of insufficient evidence and failure to sustain the required burden of proof.

*Count II: Derivative Claim for Breach of Fiduciary Duties (Against Defendants A. S. Cappellari, Rose Mary Cappellari, and David Cappellari)*

The plaintiff alleges in Count II of his Amended Bill of Complaint that defendants A. S. Cappellari, Rose Mary Cappellari, and David Cappellari breached their fiduciary duty to MBS by participating in a "scheme to transfer control of MBS's assets and business to David Cappellari." (Amended Bill of Complaint, p. 15.)

The evidence is uncontradicted that defendant David L. Cappellari resigned as an officer and director of MBS by letter dated September 18, 1996. (Exhibit 2.) There is no satisfactory proof that before September 18, 1996, defendant David L. Cappellari schemed with his parents to obtain control of MBS or that he acted in any way in violation of § 13.1-690 of the Code of Virginia. After September 18, 1996, defendant David L. Cappellari did not owe a fiduciary duty to MBS as officer and director because he was no longer an officer and director of MBS.

There is no satisfactory proof either before September 18, 1996, or after September 18, 1996, that defendant David L. Cappellari obtained information to which he was not entitled or that he improperly used any such information or that he acted illegally to the detriment of MBS. Rather, he disclosed his

intention of exploring the option of opening his own building supply business (Exhibit 2) and disclosed during the special meeting of the stockholders on October 7, 1996, that he may be interested in purchasing at least some, if not all of the assets of MBS. (Exhibit 5.) On November 15, 1996, defendant David L. Cappellari submitted, by counsel, his offer to purchase the assets of MBS. Whether this offer was accepted was entirely within the discretion of the corporation, as it acted through its officers, directors, and shareholders. When the shareholders voted upon the Asset Purchase Agreement on December 20, 1996, defendant David L. Cappellari abstained and did not vote his shares of stock.

The duties of defendants A. S. Cappellari and Rose Mary Cappellari as directors of MBS were governed by §§ 13.1-690 and 13.1-724 of the Code of Virginia during the events preceding the sale of the corporation's assets. I have already thoroughly discussed and ruled upon their actions as directors and their fiduciary duties as such in this letter opinion as it pertains to Count I of plaintiff's amended Bill of Complaint. I do not feel it necessary to repeat those rulings and findings of fact and hereby adopt them for the purpose of ruling on Count II of plaintiff's Amended Bill of Complaint. Moreover, there is no satisfactory proof of a scheme by defendants A. S. Cappellari, Rose Mary Cappellari, and David L. Cappellari that alters in any way my previous rulings.

Count II of plaintiff's Amended Bill of Complaint is therefore dismissed for reasons of insufficient evidence and failure to sustain the required burden of proof.

*Count III: Derivative Claim for Breach of Fiduciary Duty (Against Defendants A. S. Cappellari, Rose Mary Cappellari, and David Cappellari)*

Plaintiff alleges in Count III of his Amended Bill of Complaint that defendants A. S. Cappellari, Rose Mary Cappellari, and David L. Cappellari violated their fiduciary duties to MBS by executing a plan to "bleed the company" of its profits. Specifically, plaintiff alleges that these defendants breached their fiduciary duties to MBS by authorizing excessive salaries, bonuses, and benefits; by using company funds for personal expenses; and by receiving indemnification from MBS for legal expenses incurred in earlier litigation.

This Count received rather limited attention at trial, both in terms of evidence and argument, and in my opinion, this approach was appropriate in view of the other issues in dispute.

Evidence was presented at trial concerning the salary, bonuses, and benefits paid to defendant David L. Cappellari, but there was insufficient evidence to support a finding that these payments were unauthorized. Rather, the evidence supports a finding that such payments were authorized by appropriate corporate action. Whether these payments were excessive depends upon a determination of defendant David L. Cappellari's importance to the corporation. The defendants presented evidence and argument to establish that he was crucial to the success of MBS. The plaintiff presented evidence and argument to establish that the success of MBS was the consequence of lack of competition. At any rate, I am not satisfactorily convinced that these payments were unauthorized or excessive. Moreover, if I had found the payments to be excessive, a determination of the amount of the excess would be speculative at best.

There was also evidence presented concerning the salary of defendant A. S. Cappellari, but little evidence concerning his actual duties at MBS. Defendant David L. Cappellari did testify that his father was very popular with the customers. Again, I am not satisfactorily convinced that these payments were unauthorized or excessive.

Evidence was presented concerning payments by the company for personal expenses, such as ham biscuits and gasoline. The evidence concerning the authorization or lack of authorization for such payments, and the lack of clarity concerning the amount of such payments, do not permit a recovery in this regard.

Finally, the evidence concerning the indemnification by the company for the legal expenses incurred by the defendants during earlier litigation was very limited, yet convoluted to the extent presented. Defendant A. S. Cappellari testified that he repaid an amount to the corporation, but the amount of the repayment, the amount of the original indemnification, and the extent to which indemnification was appropriate or inappropriate were never clearly demonstrated.

Again stated, the fiduciary duty of a director to a corporation is prescribed by § 13.1-690 of the Code of Virginia. To the extent my previous rulings apply, I adopt them in this ruling on Count III of plaintiff's Amended Bill of Complaint.

Count III of plaintiff's Amended Bill of Complaint is therefore dismissed for reasons of insufficient evidence and failure to sustain the required burden of proof.

*Count IV: Derivative Claim to Void the Sale of MBS's Assets to Capps Based on Violation of Va. Code § 13.1-691 (Against Defendants A. S. Cappellari, Rose Mary Cappellari, and Capps)*

The plaintiff alleges in Count IV of his Amended Bill of Complaint that defendants A. S. Cappellari and Rose Mary Cappellari, as directors of MBS, had a conflict of interest in the transaction to sell MBS's assets to Capps Home and Building Center, Inc., and being in violation of § 13.1-691 of the Code of Virginia, the transaction should be declared void. In my opinion, the law on this issue is very clear, and I will briefly summarize that law. However, as will be seen, my ruling on this Count of the Amended Bill of Complaint turns upon my determination of fact.

At the time of the special meeting of the Board of Directors of MBS on November 19, 1996, defendants A. S. Cappellari and Rose Mary Cappellari were the only remaining directors of MBS because defendant David L. Cappellari had resigned as officer and director of MBS on September 18, 1996, (Exhibit 2) and the plaintiff had resigned as officer and director of MBS on October 7, 1996. (Exhibit 5.) Section 13.1-691 will therefore be interpreted and applied in the context of defendants A. S. Cappellari and Rose Mary Cappellari being the directors of MBS and also the parents of defendant David L. Cappellari, who was an officer and director of defendant Capps Home and Building Center, Inc., which purchased the assets of MBS.

Subsection A of § 13.1-691 provides:

A. A conflict of interest transaction is a transaction with the corporation in which a director of the corporation has a direct or indirect personal interest. A conflict of interest transaction is not voidable by the corporation solely because of the director's interest in the transaction if any one of the following is true:

(1) The material facts of the transaction and the director's interests were disclosed or known to the Board of Directors or a committee of the Board of Directors and the Board of Directors or committee authorized, approved, or ratified the transaction;

(2) The material facts of the transaction and the director's interest were disclosed to the shareholders entitled to vote and they authorized, approved, or ratified the transaction; or

(3) The transaction was fair to the corporation.

When interpreting § 13.1-691, in comparison to § 13.1-690, the Supreme Court of Virginia has stated:

Furthermore, a party challenging the actions of the Board of Directors has the burden of proving that the challenged action was not undertaken in accordance with the director's good faith business judgment of the best interests of the corporation. § 13.1-690(B). However, when a conflict of interest as defined in § 13.1-691 exists, such as Izadpanah presented here, the burden shifts to the directors to show that their actions complied with the requirements of that section.

*Izadpanah v. Boeing Joint Venture*, 243 Va. 81, 83, 412 S.E.2d 708 (1992); *Giannotti v. Hamway*, 239 Va. 14, 24, 387 S.E.2d 725, 731 (1990).

According to subsection A of § 13.1-691, a conflict of interest transaction is one in which the director has a "direct or indirect personal interest." However, subsection A further provides that a conflict of interest transaction is not voidable if any one of the subdivisions 1, 2, or 3 is true.

Subdivision 1 of subsection A has two requirements. First of all, the "material facts of the transaction were disclosed or known to the Board of Directors or a committee of the Board of Directors." The minutes of the meeting on November 19, 1996, do not reflect the formation of a committee as permitted by § 13.1-689, and because there were only two directors, the issue of a committee becomes immaterial to this entire discussion. Concerning the knowledge or disclosure of the directors themselves, I need not comment on this issue because the directors knew that defendant David L. Cappellari was their son. The Asset Purchase Agreement provided the "material facts of the transaction." The first requirement of subdivision 1, subsection A, is factually satisfied.

The second requirement of subdivision 1, subsection A, mandates the authorization, approval, or ratification of the transaction by the Board of Directors. In this regard, subsection C requires such authorization, approval, or ratification by affirmative vote of a majority of the directors "who have no direct or indirect personal interest in the transaction." Subsection C further provides that a "transaction shall not be authorized, approved, or ratified under this section by a single director." Therefore, if either or both defendants A. S. Cappellari and Rose Mary Cappellari had a "direct or indirect personal interest in the transaction," there was no compliance with subdivision 1, subsection A, and in fact, it would be numerically impossible to comply with this portion of this statute because there were only two directors. Nevertheless, the factual issue remains as to whether the directors had a "direct or indirect personal interest in the transaction."

Subdivision 2 of subsection A has two similar requirements. First of all, the personal interest of the directors and the material facts of the transaction

must be disclosed to the shareholders. As to this requirement, I find that all shareholders were aware of the familial relationship and the Asset Purchase Agreement was provided to all shareholders, thereby disclosing the material facts of the transaction.

The second requirement of subdivision 2 of subsection A mandates authorization, approval, or ratification of the transaction by the shareholders. In this regard, subdivision D states that "a conflict of interest transaction is authorized, approved, or ratified if it receives the vote of a majority of the shares entitled to be counted under this subsection." Subsection D further states that shares "owned by or voted under the control of a director who has a direct or indirect personal interest in the transaction" may not be counted for purposes of authorization, approval, or ratification of a conflict of interest transaction under subdivision 2 of subsection A. Therefore, if the directors had a "direct or indirect personal interest in the transaction," there was no compliance with subdivision 2 of subsection A because the votes of the shares owned by the directors could not be counted, and the plaintiff voted his 20% of the shares of outstanding stock against the transaction. Defendant David L. Cappellari abstained from voting his shares on this issue. Again, the issue of whether the directors had a "direct or indirect personal interest in the transaction" remains.

Before stating my factual determinations concerning a "direct or indirect personal interest in the transaction," I wish to address the issue of the burden of proof and when this burden shifts. I interpret *Izadpanah, supra*, to mean that plaintiff has the burden of proving a conflict of interest as defined by § 13.1-691. If plaintiff so establishes a conflict of interest, then the burden shifts to the directors to prove compliance with § 13.1-691. However, if I am incorrect in this interpretation, my rulings in this regard would remain the same. Even when shifting the burden of proof to the directors earlier in the proceeding, the evidence, in my opinion, weighs sufficiently in favor of the directors.

Concerning an "indirect personal interest in a transaction," subsection B provides the controlling definition:

> B. For the purposes of this section, a director of the corporation has an indirect personal interest in a transaction if:
> 1. Another entity in which he has a material financial interest or in which he is a general partner is a party to the transaction; or
> 2. Another entity of which he is a director, officer, or trustee is a party to the transaction and the transaction is or should be considered by the Board of Directors of the corporation.

"Another entity" in the context of this case, can only apply to defendant Capps Home and Building Center, Inc. There was absolutely no evidence presented that would tend to prove that directors A. S. Cappellari and Rose Mary Cappellari had "a material financial interest" in Capps Homes and Building Center, Inc.; or that they were general partners in Capps Home and Building Center, Inc.; or that they were directors, officers, or trustees of Capps Home and Building Center, Inc. I therefore find as fact in this case that defendants A. S. Cappellari and Rose Mary Cappellari did not have an "indirect personal interest in the transaction" as directors of MBS.

A definition of "direct personal interest" is not provided in the statute. Nevertheless, after considering the statutory definition of "indirect personal interest in the transaction," I am convinced that the Legislature could only have intended a "direct personal interest" to mean a personal interest which is much closer and much more compelling than one defined as an "indirect personal interest" which, I note, is most certainly not insignificant in itself.

In paragraph 44 of his Amended Bill of Complaint, the plaintiff alleges that the defendants A. S. Cappellari and Rose Mary Cappellari "acted out of a personal desire to see their son, David Cappellari, obtain control of MBS's assets for an unfairly low price and out of a personal desire to lessen the impact of taxes on their respective estates." (Amended Bill of Complaint, at p. 9.) Although this allegation was repeated at trial, there was no evidence presented by either party concerning the tax obligation of defendants A. S. Cappellari and Rose Mary Cappellari or the potential impact that the sale of the assets of MBS would have on such tax obligation. Consequently, regardless of the issue of the shifting of the burden of proof, when the evidence is viewed in its entirety, this allegation fails as a basis for a finding of a "direct personal interest in the transaction" on the part of the directors.

In support of Count IV of his Amended Bill of Complaint, the plaintiff relied heavily at trial upon the fact that the defendant, David L. Cappellari, who was also an officer and director of defendant Capps Home and Building Center, Inc., is the son of defendants A. S. Cappellari and Rose Mary Cappellari. During argument at trial, the plaintiff seemed to invite the court to adopt a rule that such a familial relationship constitutes a conflict of interest *per se*. As stated earlier in this opinion, I decline to adopt such a *per se* rule, and in my opinion, whether a conflict of interest arises from a familial relationship depends upon all the attendant circumstances. As finder of fact in this proceeding, I am entitled to use common sense and draw upon ordinary human experience. Within such ordinary human experience, there are too many commonly known instances in which familial relationships have resulted in tremendous discord and difficulty, and even violence. Therefore, I do not

believe that familial relationships always cause people to act in disregard of other duties owed by them.

Other than the familial relationship between son and parent, the plaintiff presented little direct evidence that would tend to prove "a direct personal interest in the transaction." The plaintiff did present evidence from his perspective concerning the manner in which the directors implemented the corporate formalities required for the sale of the corporation's assets, the financial information provided to defendant, David L. Cappellari, and what plaintiff considers to be a grossly inadequate price for the assets of MBS. From this evidence and other evidence presented at trial, the plaintiff infers that defendants A. S. Cappellari and Rose Mary Cappellari disregarded their duties to MBS in favor of their relationship with their son. I have previously discussed much of this evidence and will do so further in subsequent portions of this opinion. For purposes of this portion of the opinion, I rule that plaintiff's evidence, and all the reasonable inferences from this evidence, fail to establish that defendants A. S. Cappellari and Rose Mary Cappellari had a "direct personal interest in the transaction."

The evidence presented by the defendant on this issue included the testimony of defendant A. S. Cappellari. Concerning the sale of the corporation's assets, Mr. Cappellari testified that both he and his wife very much wished to maintain the status quo and for MBS to continue to operate, with their son as manager, as it had in the past. Defendant David L. Cappellari, during his testimony at trial, confirmed this desire of his parents.

Because of the protective order that was previously entered by the court in this matter, I will not specifically address in this opinion the finances of MBS. Nevertheless, I feel free to state, in view of the evidence and argument at trial, that MBS realized substantial profits during the years preceding the sale of its assets. The defendants A. S. Cappellari and Rose Mary Cappellari, who jointly owned 75% of the shares of MBS's stock, received 75% of the annual distributions. Mr. and Mrs. Cappellari are retired; they liked receiving their distributions; and they wanted the situation to continue indefinitely.

Their son, defendant David L. Cappellari, was not satisfied with the status quo, and he felt he had no future at MBS in view of the Stock Purchase Agreement granting plaintiff the right of first refusal. David Cappellari consequently resigned as officer and director of MBS and disclosed his intent to either open a competing business or purchase the assets of MBS.

The evidence overwhelmingly established that defendants A. S. Cappellari and Rose Mary Cappellari were most unhappy with their son and considerable discord and disharmony resulted in their familial relationship. Defendant Rose Mary Cappellari left Bedford County, emotionally distraught,

and was hospitalized in December 1996. Defendant A. S. Cappellari testified that he prayed his son would return to MBS, and his emotion, during this testimony, was readily apparent, and in my opinion, sincere.

In my opinion, the defendants A. S. Cappellari and Rose Mary Cappellari did not wish to sell the assets of MBS to their son, or to the plaintiff, or to anyone else. They wished everything to remain the same, but this was not to be. As counsel stated at trial, the golden goose was dead.

Furthermore, I do not believe that the relationship that Mr. and Mrs. Cappellari had with their son caused them to act in disregard of their duties to MBS. If anything, the opposite may be true, and at times, their relationship with MBS may have caused them to act in disregard of their relationship with their son.

In the end, defendants A. S. Cappellari and Rose Mary Cappellari were faced with a choice among several options, none of which was the one they preferred. The decision to sell the assets of MBS at the price proposed by Capps Home and Building Center, Inc., has been discussed previously and will be discussed further subsequently. As to this Count of the Amended Bill of Complaint, I determine as fact in this case that defendants A. S. Cappellari and Rose Mary Cappellari did not have a "direct personal interest in the transaction" as I understand the meaning of that phrase in the context of § 13.1-691. Moreover, though I understand that defendant David L. Cappellari essentially owns defendant Capps Home and Building Center, Inc., it is worth noting in the context of a "direct personal interest in the transaction," that the assets of MBS were sold to Capps Home and Building Center, Inc., and not sold to David L. Cappellari directly.

Finally, I will address subdivision 3 of subsection A. This subdivision provides that a conflict of interest transaction will not be voidable if the "transaction was fair to the corporation." This portion of the statute essentially requires in this case a determination of the fairness of the price paid for the assets of MBS.

As stated previously, the testimony at trial, including expert testimony, varied dramatically as to the value of MBS's assets. These values ranged from approximately $800,000, as testified by Dr. Bonomo for the defense, and $5,000,000 as initially indicated by the plaintiff. As I have also stated previously, the basis for this wide range of valuation depends upon the value placed upon defendant David L. Cappellari as manager of MBS. The witnesses for the plaintiff maintained that the success of MBS was the result of the lack of competition rather than the efforts of key personnel. The witnesses for the defendants maintained that defendant David L. Cappellari

was crucial to the success of MBS, and his loss as manager and his opening a competing business in the area would substantially reduce the value of MBS.

Dr. Bonomo testified that the smaller the corporation, the more important its people are. In this regard he provided a comparison between McDonald's and a small locally owned restaurant. I find his testimony in this regard to be the most persuasive. I further find that defendant David L. Cappellari was extremely important to the success of MBS and that his departure and his opening a competing business would substantially reduce the value of MBS. Indeed, the plaintiff himself, as previously discussed, testified in a prior hearing that competition from a business owned and operated by defendant David L. Cappellari would reduce the value of MBS by a third. (Transcript of 10/24/96 hearing at 97.)

In accordance with these findings of fact, I accept the testimony of Dr. Bonomo, who valued MBS at approximately $800,000, and the testimony of Hope Player and Larry Lynch who stated that the price provided by the Asset Purchase Agreement was fair. I determine as fact in this case that the transaction of selling the assets of MBS was fair to the corporation, as provided by § 13.1-691(A)(3) of the Code of Virginia.

For these reasons, Count IV of plaintiff's Amended Bill of Complaint is dismissed.

*Count V: Derivative Claim for Violation of Va. Code § 18.2-499 et seq. (Against All Defendants)*

In Count V of his Amended Bill of Complaint, the plaintiff alleges that all defendants to this proceeding "combined, associated, agreed, mutually undertook, or concerted together for the purpose of willfully and maliciously injuring MBS and its business" in violation of § 18.2-499 *et seq.* of the Code of Va. (Amended Bill of Complaint, p. 18.) My ruling as to this allegation is based upon my findings of fact, as previously stated, and those findings are hereby adopted and incorporated into this portion of my opinion. I make particular reference to the findings of fact that I stated when addressing Count IV of the Amended Bill of Complaint and the allegations of conflict of interest.

In summary, I do not believe that defendants A. S. Cappellari and Rose Mary Cappellari conspired with defendant David L. Cappellari to injure MBS. As previously stated, I find that defendants A. S. Cappellari and Rose Mary Cappellari wished to maintain the status quo and for MBS to continue to operate indefinitely as it did in the past. Their interests, for the most part, were at odds with the interests of defendant David L. Cappellari and not in common as proof of a conspiracy requires. As also discussed previously, defendant

David L. Cappellari, acting through Capps Home and Building Center, Inc., made an offer to purchase the assets of MBS, and I have found no illegality in his doing so. The decision to accept the offer was a decision made by MBS, acting through its directors and shareholders, and I have found no illegality in that regard. I have also previously found the price paid by Capps Home and Building Center, Inc., to be fair to the corporation, meaning that there is no proof of damage to the corporation.

Therefore, Count V of plaintiff's Amended Bill of Complaint is dismissed for reasons of insufficient evidence and failure to sustain the required burden of proof.

*Count VI: Derivative Claim for Common Law Conspiracy (Against All Defendants)*

In Count VI of his Amended Bill of Complaint, plaintiff alleges that all defendants to this proceeding engaged in a common law conspiracy.

The Supreme Court of Virginia has defined a common law conspiracy as follows:

> A common law conspiracy consists of two or more persons combined to accomplish, by some concerted action, some criminal or unlawful purpose or some lawful purpose by a criminal or unlawful means.

*Commercial Business Systems v. BellSouth*, 249 Va. 39, 48, 453 S.E.2d 261 (1995).

When ruling upon this Count of plaintiff's Amended Bill of Complaint, I again adopt and incorporate into this portion of my opinion my findings of fact as previously stated.

A common law conspiracy requires proof of concerted action on the part of two or more persons. As previously stated, I have found that defendant David L. Cappellari made an offer to purchase the assets of MBS through his corporation, Capps Home and Building Center, Inc., and I have found no illegality in his doing so. Therefore, this Count fails because, generally, a corporation cannot conspire with itself.

To the extent there are exceptions to this general rule, I rely upon my previous findings of fact as they pertain to the actions and conduct of defendants A. S. Cappellari and Rose Mary Cappellari.

For the reasons previously stated, I also find that there is insufficient evidence of a criminal or unlawful purpose or some lawful purpose having been accomplished by criminal or unlawful means.

Furthermore, I have found the price paid to MBS for its assets to be fair to the corporation, and, as a consequence, there is no damage in the legal sense to the corporation.

Count VI of plaintiff's Amended Bill of Complaint is therefore dismissed for reasons of insufficient evidence and failure to sustain the required burden of proof.

*Count VII: Derivative Claim for Imposition of Constructive Trust (Against Defendant Capps)*

In this Count of his Amended Bill of Complaint, the plaintiff alleges that defendant Capps Home and Building Center, Inc., has been unjustly enriched, and plaintiff requests the court to impose a constructive trust on the assets and income of Capps Home and Building Center, Inc., to prevent a failure of justice.

For the reasons stated, and repeatedly stated, I rule that the evidence does not present a sufficient basis for this claim for relief.

Count VII of plaintiff's Amended Bill of Complaint is therefore dismissed for reasons of insufficient evidence and failure to sustain the required burden of proof.

## Conclusion

I have stated, to the extent possible, my rulings and findings of fact supporting my decision to dismiss plaintiff's Amended Bill of Complaint. Moreover, I adopt the arguments and authorities submitted by the defendants to this proceeding to the extent they are consistent with this opinion.